IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SEBASTIAN RICHARDSON,

PLAINTIFF,

v.

THOMAS R. KANE, JOSEPH
NORWOOD, BRYAN A. BLEDSOE,
DAVID YOUNG, D. HUDSON, B.
TRATE, S. SNIDER, LT. MATTLY, LT.
J. FLEMING, LT. P. CARRASQUILLA,
LT. M. SAYLOR, LT. SEAMAN, LT.
SEEBA, LT. MILLER, LT. JOHNSON,
LT. SCAMPONE, LT. WHITTAKER,
and JOHN DOE LIEUTENANTS,

DEFENDANTS.

CIVIL ACTION

Case No.:

Jury Trial Demanded

*Electronically Filed*

## COMPLAINT

Plaintiff Sebastian Richardson brings this action for damages, injunctive, and class relief against the Defendants, complaining and alleging as follows:

## NATURE OF THE CASE

1.      This civil rights case is brought against Defendants for injunctive relief and monetary damages for violations of Plaintiff Sebastian Richardson's ("Plaintiff" or "Mr. Richardson"), Eighth and Fifth Amendment rights under the United States Constitution.  Mr. Richardson also asserts class claims for injunctive relief on behalf of all current and future prisoners in the Special Management Unit (SMU) at

the United States Penitentiary at Lewisburg (USP Lewisburg), pursuant to Federal

Rule of Civil Procedure 23, for the unconstitutional and unconscionable conditions

of confinement that Plaintiff individually, and all inmates collectively, must endure

on a day-to-day basis.

Defendants, acting under color of federal law, engaged and continue to

engage in a pattern, practice or policy of placing hostile inmates together in cells

and/or recreation cages despite the serious risk that the hostile inmates will cause

substantial material harm to each other.  As part of this placement pattern, practice

or policy, Defendants punish inmates who refuse dangerous placements by putting

them in restraints for hours at a time, sometimes as long as twenty-four (24) hours

or more.  These restraints significantly restrict an inmate's arm and leg motion, and

in some cases, inmates are strapped to a bed with their limbs tied down in a brutal

procedure known as four pointing.  If an inmate does not refuse the hostile

cellmate placement, violence is likely to occur.  Furthermore, Defendants, again

acting under color of federal law, engaged and continue to engage in a pattern,

practice or policy of failing to intervene to prevent substantial material harm to

inmates resulting from dangerous placements.  There have been at least two inmate

deaths at USP Lewisburg attributable to this systemic failure. Defendants have

deprived and continue to deprive the members of the class of their constitutional

right to be free from cruel and unusual punishment, in violation of the Eighth

Amendment to the United States Constitution and their right to due process under the Fifth Amendment.  If appropriate injunctive relief is not granted, the harms suffered will be irreparable, may lead to death, and will continue for the foreseeable future.

Plaintiff has personally endured two categories of this conduct:  (1) He has been forced to share a cell with a known hostile inmate, facing the threat of violence from that cell pairing; and (2) he has been placed in restraints on multiple occasions for refusing dangerous cell assignments with hostile inmates.  Plaintiff seeks compensatory and punitive damages on behalf of himself, as well as injunctive relief on behalf of all current and future USP Lewisburg inmates.

## JURISDICTION AND VENUE

2.      Plaintiff brings this action under the Fifth and Eighth Amendments to the United States Constitution and under Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971).

3.      This Court has subject matter jurisdiction over the federal claims presented herein pursuant to 28 U.S.C. §§ 1331 and 1343.

4.      Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b), because this is the district in which Plaintiff's claims arose.

5.     This Court has personal jurisdiction over each Defendant because it is believed that at all times relevant to this action all Defendants were employed in Lewisburg, Pennsylvania, and/or their acts and omissions caused the harm complained of by Plaintiff in the Commonwealth of Pennsylvania.

## PARTIES

6.     Plaintiff, Sebastian Richardson, is a prisoner incarcerated at USP Lewisburg, a federal prison operated by the Bureau of Prisons ("BOP"), located in Union County, Pennsylvania.

7.     Defendant Thomas R. Kane is the Acting Director of the Bureau of Prisons ("BOP").  Mr. Kane is being sued in his official capacity.

8.     Defendant Joseph Norwood is the Regional Director of the Northeast Region for the BOP, which includes USP Lewisburg.  Mr. Norwood is being sued in his official capacity.

9.     Defendant Bryan A. Bledsoe is the Warden of USP Lewisburg.  He is responsible for overseeing and implementing inmate housing and recreation placement decisions and for approving the use of restraints.  Mr. Bledsoe is being sued in his individual and official capacities.

10.     Defendant David Young is an Associate Warden at USP Lewisburg.  He is responsible for custody and security at the institution, including decisions

involving cellmate and recreation cage placements and the use of restraints.  Mr. Young is being sued in his individual and official capacities.

11.     Defendant D. Hudson is an Associate Warden at USP Lewisburg.  He is responsible for custody and security at the institution, including decisions involving cellmate and recreation cage placements and the use of restraints.  Mr. Hudson is being sued in his individual and official capacities.

12.     Defendant B. Trate is a Captain at USP Lewisburg.  He is responsible for custody and security at the institution, including decisions involving cellmate and recreation cage placements and the use of restraints.  Mr. Trate is being sued in his individual capacity.

13.     Defendant S. Snider is a Deputy Captain at USP Lewisburg.  He is responsible for custody and security at the institution, including decisions involving cellmate and recreation cage placements and the use of restraints.  Mr. Snider is being sued in his individual capacity.

14.     Defendants Scampone, Fleming, Carrasquilla, Saylor, Mattly, Seaman, Seeba, Miller, Johnson, and Whittaker are Lieutenants at USP Lewisburg. They are responsible for custody and security at the institution, including decisions involving cellmate and recreation cage placements and the use of restraints. These Defendants are being sued in their individual capacities.

15.     Defendants John Doe Lieutenants are Lieutenants at USP-Lewisburg who conducted checks on Mr. Richardson during his May 17, 2011 to June 2, 2011 placement in restraints.  They are responsible for custody and security at the institution, including decisions involving cellmate and recreation cage placements and the use of restraints. They are being sued in their individual capacities.

## FACTS

General Background on the USP Lewisburg Special Management Unit

16.     In 2008, the BOP created a Special Management Unit ("SMU") at USP Lewisburg.

17.     According to the SMU Program Statement, the SMU program is meant to serve inmates who present "unique security and management" concerns including inmates who have a history of violence or who "participated in or had a leadership role in geographical group/gang-related activity."  U.S. Dept. of Justice, *Program Statement: Special Management Units* § 1.

18.     Inmates within the federal correctional system are sent to the SMU because the SMU is designed to provide "greater management of their interaction to ensure the safety, security, or orderly operation of the Bureau facilities, or protection of the public."  *Id.* § 1.

19.    The SMU cells were originally designed to hold one person.  The amount of space available to inmates is further limited by the pattern, practice or policy of forcing SMU members to take cellmates.

20.    Inmates are placed together in cells throughout their time at the SMU, regardless of an inmate's self-professed inability to get along with others or history of violence.

21.    In the first two levels of the program, SMU inmates are required to stay in their cells for 23 hours a day.

22.    In the first two levels of the program, SMU inmates are usually offered one (1) hour of "recreation" per day, five days per week, which consists of taking inmates from their cells and placing them in recreation cages.

23.    Many inmates choose not to go out of their cells to the recreation cages due to their fear of attack by a hostile inmate, and thus remain in their cells 24 hours a day.

24.    These conditions place inmates with a history of violence and gang membership in close quarters for every hour of every day, leading to an obvious and pervasive threat of violence.

25.    It is the responsibility of the BOP, the Northeast Regional Office of the BOP, and all officials and corrections officers at USP Lewisburg to ensure that this threat of violence does not become a reality.

26.     Because of this known potential for inmate on inmate violence, upon entering the SMU program at USP Lewisburg, inmates participate in an intake interview with USP Lewisburg officials, often referred to as the "Quay" hearing.

27.     One of the purposes of this interview is to gather information about the inmate so that prison officials can make safe and appropriate placement decisions for the inmate and avoid placing hostile inmates together.

28.     At this intake interview, security information in the inmate's BOP file is reviewed and inmates disclose their separation needs and known enemies, including specific geographic groups or gangs with whom an inmate has problems.

29.     Following the intake interview, the new inmate is given a cell block assignment, cell assignment, and recreation cage schedule.  These placement decisions are determined in part by the Cell Assignment Committee (the Committee), with assistance from the Corrections Officers on each cell block.

30.     Upon information and belief, at all times relevant to this case the Committee included Defendants Bledsoe, Trate, Young, and Hudson.

31.     Defendants Young and Hudson are specifically tasked by the BOP's SMU Program Statement with inmate placement decisions: "[t]he Associate Warden is responsible for determining which inmates may be housed or participate in activities together, as necessary to protect the safety, security, and good order of

the institution." U.S. Dept. of Justice, *Program Statement*: *Special Management Units* § 6.

32.     In making decisions on inmate placement, the Committee is required to consider inmate safety.  Therefore, the Committee is required to account for an inmate's particular need to be separated from other individuals or groups inside the prison who are hostile towards him.

33.     Some categories of inmates who are known to be hostile to one another are rival gang members and inmates who are known to be assaultive to their cellmates. A "hostile" inmate may also be someone who has had a particular conflict with the proposed cellmate.

34.     Information discussed at the Quay hearing, as well as information about separation needs, is shared with staff so that they can carry out their duties.

35.     After the Quay hearing, inmates continue to inform Corrections staff of new inmate enemies or geographic groups or gangs that they believe pose a substantial risk of material harm to them.

36.     Defendants are aware, by virtue of their experience and training and the history of violent attacks in the SMU, that placing hostile inmates in a cell or recreation cage together creates a substantial risk that the inmates will engage in violent conduct that can lead to injury or death.

37.     Despite this knowledge, Defendants maintain a practice of intentionally bringing hostile inmates to other inmates' cells as proposed cellmates.

38.     Inmates are rotated to new cells every twenty-one (21) days.  During this rotation, inmates sometimes receive new cellmates.  Inmates also receive new cellmate assignments if their cellmate leaves the SMU, either by completing the SMU "program" or by some other method.

39.     Thus, the possibility is regularly renewed that every inmate in the SMU will be placed with a hostile cellmate who poses a substantial risk of harm to the inmate.

40.     Many inmates have suffered violent physical harm at the hands of other inmates in cells and/or recreation cages.

41.     From 2008 until July 2011, there were 272 reported incidents of inmate on inmate violence.

42.     Inmates frequently inform Corrections staff that a placement assignment is inappropriate because the prospective cellmate is hostile to the inmate and poses a substantial risk of material harm to the inmate.

43.     These warnings are either ignored by the Corrections staff or are directly acknowledged but not acted upon.  It is thus a pattern, practice or policy of Corrections staff to force inmates to accept placements that pose a substantial risk

of material harm to inmates, and to reserve reassignment until after inmate-on-inmate violence actually takes place.

44.     Upon information and belief, Defendants are involved in the cell and recreation cage assignment practices and policies, know the risks of harm posed by these practices, and fail to make any changes to these policies and practices at USP Lewisburg to abate the risks of harm.


Failure to Intervene to Prevent Inmate on Inmate Violence

45.     The danger created by assigning hostile inmates to the same cell or recreation cage is compounded by the fact that the USP Lewisburg Defendants have a pattern, practice or policy that Corrections Officers are not to enter cells or recreation cages to stop inmate on inmate attacks until the attack has concluded and the victim of the attack may have already sustained serious injury.

46.     The risk that the victim inmate will suffer serious harm from the attack is readily apparent to the Corrections Officers in each and every one of these cases. In fact, two inmates have died at the hands of hostile cellmates in the last two years.  See R.A. Walker, "Group: Prison Conditions Lead to 'Cycle of Violence,'"(Sept. 15, 2010) available at http://www.sungazette.com/page/content.detail/id/553671.html.

47.     Defendants have nonetheless adopted a pattern, practice or policy of failing to intervene to prevent harm in these circumstances.


### Punitive Use of Restraints

48.     To enforce the pattern, practice or policy of placing hostile inmates together, the Defendants engage in a pattern, practice or policy of punishing inmates who resist dangerous placements by placing them in punitive restraints.

49.     These restraints include "four point restraints" (four-pointing), "black boxes," and/or "ambulatory restraints."

50.     "Ambulatory restraints" are defined by BOP policy as "soft and hard restraint equipment which allow the inmate to eat, drink, and take care of basic human needs without staff intervention."  See U.S. Department of Justice, Program Statement 5566.06, Use of Force and Application of Restraints (hereinafter P.S. 5566.06") at 11.  At USP Lewisburg, however, "ambulatory restraints" are hard restraints and are applied in such a manner as to cause severe pain and to prevent the inmate from eating, drinking, and toileting.

51.     A "black box" is another type of restraint.  It is made of a plastic or rubber material that fuses the left and right handcuff together to make them more restrictive than traditional handcuffs.

52.     Four-point restraints, otherwise known as "four-pointing," involve placing an inmate on a bed frame.  The inmate's hands are restrained separately overhead, attached by metal shackles to either the bed frame or to the wall behind the bed, while the inmate's legs are also separated and restrained by metal shackles to the foot of the bed frame.  While in four-point restraints, the inmate's limbs are stretched out, and his ability to move is completely restricted.

53.     "Hard restraints" consist of metal handcuffs, metal shackles and a metal chain that encircles the body.  Such a chain is usually put around an inmate's waist.  At USP Lewisburg, however, the practice is to put the chain farther up on the torso so that it is actually around the inmate's chest.  The handcuffs are attached to the chain.  The chain can be tightened, as can the handcuffs and shackles.  The handcuffs prevent the inmate from moving his wrists.  In addition, the inmate cannot move his hands up or down because the handcuffs are attached to the chest-high chain.  The shackles prevent an inmate from climbing up to the top bunk of a cell and severely limit an inmate's ability to walk.

54.     According to the policy, restraints are only to be used to control an inmate who is a danger to government property, himself and/or others, and never as punishment.  *See* U.S. Department of Justice, *Program Statement 5566.06, Use of Force and Application of Restraints.*

55.    "An employee may not use brutality, physical violence, or intimidation toward inmates, or use any force beyond that which is reasonably necessary to subdue an inmate."  See id.

56.    Under BOP policy, force, including the application of restraints, can be used "only as a last alternative after all other reasonable efforts to resolve a situation have failed."  See P.S. 5566.06 at 1.

57.    Staff must use "only that amount of force necessary to gain control of the inmate, to protect and ensure the safety of inmates, staff and others, to prevent serious property damage, and to ensure institution security and good order."  See id.

58.    BOP policy forbids the Use of Force or restraints to punish inmates and dictates that restraints should only be used "when other effective means of control have failed or are impractical."  See id. at 6-7.

59.    Restraints may not be used "in a manner that causes unnecessary physical pain or extreme discomfort."  See id. at 7.

60.    At USP Lewisburg, restraints are applied contrary to BOP policy, as a form of punishment for refusing to cell with a hostile inmate.

61.    USP Lewisburg officials regularly put in restraints inmates who resist accepting a placement with a hostile inmate.

62.     Restraints are applied and maintained in an excessively tight manner, causing severe pain, numbness, swollen wrists and fingers, open wounds, breathing problems and possibly nerve damage.

63.     The inmate may also later be placed in four-point restraints.

64.     Under BOP policy, only the Warden is permitted to authorize four-pointing. See PS 5566.06 at 12.

65.     The inmate remains restrained for as long as USP Lewisburg officials choose, without any meaningful oversight or process.

66.      In addition to causing extreme pain, numbness, and breathing problems, being in hard restraints impacts every aspect of daily life.

67.     To eat, an inmate must use the bottom bunk in the cell as a table.

68.     Because an inmate in restraints cannot move his hands independently from each other or away from his body, eating can only be attempted by leaning the whole torso (with hands protruding in front) towards the food tray on the bottom bunk to grab the food, followed by an attempt to get the food into the mouth by stretching the hands upwards.

69.     Eating causes a great deal of pain because the restraints move up the forearms during this process, cutting into the skin.

70.     Drinking water from a cup is nearly, if not completely, impossible in restraints, due to the configuration of hands attached to each other and bound to the chest.

71.     Getting water from the metal push-button sinks is similarly difficult and results in being sprayed with water.  In the wintertime, when the cells are cold because the windows are often intentionally kept open by staff, trying to get water from the sink can have lasting chilling effects.

72.     Hygiene is difficult to maintain while in hard restraints.

73.     Inmates in restraints are not permitted to shower or shave regularly.

74.     If an inmate is fortunate enough to get a toothbrush or toothpaste, he can try to brush his teeth, but this is nearly impossible when in restraints.

75.     Inmates in restraints are supposed to be offered a bathroom break every two hours, during which their handcuffs (or at least one handcuff) are released so that they can use the toilet.

76.     However, staff regularly deny inmates bathroom breaks, which forces the inmates to use a painful process to try to move aside their clothing and use the toilet while still in the hard restraints.

77.     Because of the tight handcuffs and the arrangement of the hands in front of the body, attached tightly to each other and the upper chest, it is incredibly painful to the inmate's hands, wrists, and arms to try to use the toilet.  As a result of this

awkward and painful process, the floor of the cell becomes covered in urine and feces.

78.    While inmates are in the cells, the cells are not cleaned and there are no cleaning supplies made available to them.

79.    Inmates in restraints are routinely double-celled.  When in hard restraints in a cell with another restrained inmate, one inmate must sleep on a thin mattress on the floor, because it is impossible to climb to the top bunk when in restraints.

80.    The mattresses often have Oleoresin Capsicum ("OC") spray or residue from other chemical weapons on their surface from the manner in which they are handled by the Officers.

81.    Because the mattresses remain on the floor, they also are often splattered with urine and feces due to the inmates' inability to toilet while in restraints.

82.    Under these circumstances, inmates are frequently deprived of sleep.

83.    Defendants are aware of the conditions in the restraints rooms, described above.

84.    Defendants order or authorize inmates' placement in these conditions, in hard restraints, as part of their program to enforce hostile cell assignments.

85.    Inmates have no process by which to challenge the imposition of prolonged and painful periods in restraints.  This punishment exists wholly outside of the BOP disciplinary system.

86.     As of the date of this complaint, Plaintiff Richardson has been

unconstitutionally restrained twice in this manner for refusing to accept a cellmate

whom Defendants knew presented a risk of substantial harm to Plaintiff's safety.

### The February 3, 2011 to March 2, 2011 Restraints Placement

87.     For 28 days, from February 3, 2011 to March 2, 2011, Defendants kept the

Plaintiff, Mr. Richardson, in hard restraints in unsanitary and inhumane conditions,

as described above, intentionally, in order to punish him for refusing to accept a

dangerous cell assignment.

88.      Mr. Richardson arrived at USP Lewisburg in March 2010 to participate in

the SMU program.

89.      When he arrived, during his Quay hearing, Mr. Richardson told Lewisburg

staff which categories of inmates he could not safely be celled with.

90.     Apart from these discussions in March 2010, USP Lewisburg staff knew

about Mr. Richardson's separation needs because he had been housed at Lewisburg

previously – during 2007 and 2008.

91.     After his arrival in 2010, Mr. Richardson was celled with a compatible

inmate.

92.     This compatible cell pairing lasted for approximately seven months until

Defendants moved that inmate out of Mr. Richardson's cell.

93.    On February 3, 2011, corrections staff asked Mr. Richardson to "cuff up" to accept a cellmate known as "the Prophet."

94.    Mr. Richardson knew that "the Prophet" had a highly assaultive reputation and had attacked over 20 former cellmates.

95.    Defendants knew about these assaults as well, as many had occurred at USP Lewisburg.

96.    When "the Prophet" was brought to Mr. Richardson's cell, he had just been released from hard restraints, which he had been placed in for refusing a cellmate and he was rocking back and forth in agitation as he waited outside Mr. Richardson's cell door.

97.    Due to his fear of assault, Mr. Richardson refused to cuff up to accept the hostile inmate as a cellmate.

98.    Corrections staff asked Richardson if he was refusing a cellmate, and he replied that he was.

99.    Staff then took "the Prophet" away.

100.    Approximately thirty minutes later, Defendant Fleming led a Use of Force team to Mr. Richardson's cell.  The team asked him if he would submit to restraints, and he replied that he would.  Mr. Richardson agreed to go with them and did not resist or refuse any of their instructions.

101.   The Use of Force team took Mr. Richardson to a laundry area where he was stripped, put into paper clothes, and placed into hard restraints.

102.   The team members put the restraints on so tightly that as they were applied, Mr. Richardson reflexively began screaming in pain.

103.   As part of the restraints, the team also applied the chain so tightly around Mr. Richardson's chest that it caused pain and interfered with his breathing.

104.   The team also applied metal shackles to Mr. Richardson's ankles.  The shackles were applied so tightly that they cut into Mr. Richardson's Achilles tendon and ankle.  This made walking very painful, as any normal flexing of the foot causes the shackles to cut further into the Achilles tendon.

105.   Mr. Richardson was then taken from the laundry area to a cell and placed with a cellmate who was also in hard restraints.  The window in the cell was open, even though it was February and very cold.

106.   Three days later, on or about February 6, 2011, Mr. Richardson was moved to a different cell and placed with another inmate who was also in restraints.  The other inmate was pleading for help because of the pain caused by the restraints.  He stated that he could not breathe because of the chest chain and he could not feel his hands because of the tight handcuffs.

107.   On February 10, 2011, Mr. Richardson was put into four-point restraints.

108.   Defendant Bledsoe authorized the application of four-point restraints on Mr. Richardson.

109.   Mr. Richardson screamed out in pain when the four-point restraints were applied, as his arms and legs were pulled away from his body by means of tightly cuffed metal handcuffs and shackles attaching his wrists and ankles to points on the bed frame.

110.   While in four-point restraints, Mr. Richardson asked for water and for a urinal.  He was denied both by the Lieutenants, including Defendant Scampone, who came in to check on his restraints.

111.   As a result, while restrained to the bed, Mr. Richardson urinated on himself and was left in soiled paper clothing.

112.   During this time period in four-point restraints, in early February, Defendant Scampone opened the window in Mr. Richardson's cell.

113.   Mr. Richardson suffered due to the cold air coming in through the open window.

114.   He spent over eight hours in four-point restraints that painfully stretched his body and caused pain to his ankles and wrists.

115.   Approximately eight hours later, Mr. Richardson was taken out of four-point restraints and put back in hard "ambulatory" restraints.  He remained in hard restraints from February 10 to February 23, in the cell conditions described above.

116.   On or about February 23, 2011, Defendants took Mr. Richardson out of restraints for approximately two hours and he was given a shower – the first in weeks.

117.   After the shower, Defendants again tried to force Mr. Richardson into a dangerous cellmate assignment.

118.   Mr. Richardson refused and was immediately put back into hard restraints.

119.   Defendant Fleming told Mr. Richardson that because he had been out of restraints for approximately two hours, they could "start his time over" in restraints, or words to that effect.

120.   In this manner, Defendants were able to keep Mr. Richardson in hard restraints for longer periods of time than permitted under BOP policy.

121.   Under BOP policy, staff must regularly check on the placement of an inmate's restraints.  The Lieutenant is also supposed to determine whether the inmate should remain in restraints or whether he should be released.[1]

122.   Defendants Mattly, Carrasquilla, Fleming, Saylor, Seaman, Seeba, Miller and Johnson conducted checks on Mr. Richardson during this restraints placement and would either enter the cell along with medical staff for the "restraint checks,"

---

[1] The inmate's health is also supposed to be checked during a "restraint check."  At USP-Lewisburg, however, medical and custody staff routinely ignore inmates' complaints of pain and other medical problems caused by tight restraints.

or, as was often the case, would walk by the cell with medical staff without entering the cell.

123.   Mr. Richardson told each of these Defendants that the restraints were too tight and were causing him severe pain.  He would plead with each of these Defendants to loosen the restraints and would plead for a bathroom break.

124.   Defendants Mattly, Carrasquilla, Fleming, Saylor, Seaman, Seeba, Miller and Johnson routinely denied these requests, causing Mr. Richardson to remain in extremely painful restraints with his paper clothing soiled by his own waste.

125.   Defendants Mattly, Carrasquilla, Fleming, Saylor, Seaman, Seeba, Miller and Johnson had the authority to release Mr. Richardson from restraints.  They were aware of his complaints of pain and were aware that he was not threatening harm or taking any other actions which would justify restraints.

126.   Despite this knowledge, Defendants Mattly, Carrasquilla, Fleming, Saylor, Seaman, Seeba, Miller and Johnson refused to release Mr. Richardson from restraints and ignored his pleas for help.

127.   During the "restraint checks," Mr. Richardson also told medical staff that the restraints were too tight and that he needed medical attention.  However, a Lieutenant is required to be present with the medical staff during the medical checks, and the medical staff deferred to the Lieutenants to determine whether the inmate needed medical attention and whether the restraints were too tight.

128.   Instead of responding to the complaints of pain caused by the restraints, when Mr. Richardson asked medical staff for medical attention, treatment, and relief, medical staff looked at the Lieutenant present in the cell and then told Mr. Richardson that they were not able to assist him.

129.   Medical staff also falsely recorded these interactions in Mr. Richardson's medical records.

130.   During the "restraint checks" and at other times, Defendants, including the Lieutenants identified above, repeatedly asked Mr. Richardson if he was ready to accept any cellmate they put him with, so that he could be let out of restraints.

131.   Defendants Trate and Snider told Mr. Richardson that the only way out of restraints was to accept any cellmate they chose for him, hostile or not, or words to that effect.

132.   When Mr. Richardson offered to identify compatible inmates he could cell with, who were currently at the institution, Defendants Trate and Snider told him that the Warden (Defendant Bledsoe) would not accept that as a solution and that the only way out of restraints was to accept any cellmate he was given.

133.   When Mr. Richardson complained to Defendant Young about the use of painful restraints as punishment for refusing dangerous cellmates and about his injuries from the restraints, Defendant Young responded that "this is what we have to do here," and that this practice would not change, or words to that effect.

134.    At some points during the restraints period, the tightness of the restraints cut off Mr. Richardson's circulation to his hands and arms and they went numb.

135.    As a result of the restraints, Mr. Richardson suffered intense pain, swelling, pressure sores, abrasions, cuts, numbness, nerve damage, and other injuries.

136.    Mr. Richardson was in hard "ambulatory" restraints for approximately 15 days before he received a toothbrush and toothpaste.

137.    Mr. Richardson was forced to sleep on the floor approximately 50% of the time, in the unsanitary conditions described above.

138.    Mr. Richardson was refused a bathroom break for the majority of the time during this 28-day period, forcing him to attempt, painfully, to use the toilet while in restraints.

139.    Defendants kept Mr. Richardson in restraints, in conditions amounting to torture, as described above, almost continuously for 28 days, from February 3, 2011 to March 2, 2011.

140.    During this 28-day period, Mr. Richardson had approximately 15 different cellmates, each of them also in hard restraints applied in the same painful and torturous manner.

141.    As was the case with Mr. Richardson, many of these inmates were put into restraints for refusing hostile cellmates.

142.    Defendants applied both hard "ambulatory" restraints and four-point restraints to Mr. Richardson for no legitimate reason, causing extreme pain and injuries, as described above.

## The May 17, 2011 to June 2, 2011 Restraints Placement

143.    After being released from restraints on March 2, 2011, Mr. Richardson was celled with a compatible cellmate.  This inmate had been at USP Lewisburg the entire time that Mr. Richardson had been in restraints.

144.    When that cellmate advanced to the next step in the SMU program, he was moved out of Mr. Richardson's cell.

145.    Defendants then brought an inmate to Mr. Richardson's cell who suffered from mental illness and needed medication to control his behavior.

146.    That inmate told Mr. Richardson that he would be alright as long as he received his medications.

147.    Defendants knew that this inmate needed medications, and he had been receiving them up to that point at USP Lewisburg.

148.    The day after he was placed in Mr. Richardson's cell, the medical staff failed to bring the inmate his medications.

149.     Both Mr. Richardson and his cellmate notified staff repeatedly that the

cellmate needed his medications, but staff refused to respond.  The inmate

continued to go without his medications.

150.     Without his medications, the inmate's behavior quickly became erratic and

threatening.  He would stay awake at night, talking in different voices, and acting

strangely.  Mr. Richardson became fearful of his behavior.

151.     Mr. Richardson remained celled with the inmate for approximately seven

days, his fear and anxiety increasing.

152.     During this time period, staff would walk by the cell door and peer in the

window.

153.     Eventually the inmate was moved out of the cell and put into a single cell.

154.     Mr. Richardson later learned that the Use of Force team had been "ready to

go" at the time that the inmate had been brought to his cell, implying that

Defendants had expected Mr. Richardson to refuse him.

155.     Defendant Young later asked Mr. Richardson whether he would accept as a

cellmate an inmate who had stabbed him while they were both at USP-Pollack.

156.     Staff later threatened to find him another dangerous cellmate.

157.     On May 17, 2011, Corrections staff brought an unknown inmate to Mr.

Richardson's cell and told Mr. Richardson to cuff up in order to accept him as a

cellmate.

158.    After the recent attempts by Defendants to place hostile cellmate with him and the threat to force another hostile cell assignment on Mr. Richardson, Mr. Richardson no longer trusted any of the cellmate assignments and therefore refused this cell assignment.

159.    As with the earlier incident, a "Use of Force" team was assembled and brought to his cell on May 17, 2011.

160.    The "team," led by Defendants Saylor and Fleming, put Mr. Richardson into hard restraints.  Mr. Richardson submitted to the restraints and complied with the orders of the "team," offering no resistance.

161.    The hard restraints were placed on Mr. Richardson in the same tight manner as before, causing severe pain and swelling.

162.    As with the first restraints placement, Mr. Richardson was kept in the small unsanitary restraints room, with extremely limited ability to eat, drink, toilet, and sleep.

163.    At one point during this restraints placement, Defendant Scampone twisted Mr. Richardson's handcuffs even tighter, causing more pain, and told him that he would let Mr. Richardson out of restraints if he would comply and go wherever they put him.

164.    Mr. Richardson responded that he would only accept a cell assignment that was safe for him.

165.    Defendant Whittaker made similar threats to Mr. Richardson, and also told

him that he would be taken out of restraints by "the team" so that he could then be

put back into restraints and his time would "start over."

166.    At one point during this restraints placement, Mr. Richardson heard another

inmate who was in restraints screaming out in pain in a nearby cell.

167.    The inmate screamed that staff was breaking his arm.

168.    Shortly after that, Corrections Officer Dreese walked by Mr. Richardson's

cell and said "You're next!"

169.    Soon after that, Mr. Richardson was put into four-point restraints again on

May 31, 2011, by Lt. Carrasquilla and a "Use of Force" team.

170.    Defendant Bledsoe authorized the application of four-point restraints on

Mr. Richardson.

171.    Defendants kept Mr. Richardson in four-point restraints from May 31, 2011

until June 1, 2011.

172.    During this time period, Defendant Johnson denied Mr. Richardson a

bathroom break, which resulted in his urinating on himself and remaining in his

soiled clothing, still in four-point restraints, for hours.

173.    Defendants took Mr. Richardson out of four-points and put him back into

hard "ambulatory" restraints on June 1, 2011, where he remained for one more

day.

174.     As with the earlier restraints placement, Mr. Richardson pleaded with and complained to the Lieutenants who accompanied medical staff during the "restraint checks" (Defendants John Doe Lieutenants), and at other times, that the restraints were too tight and were causing him severe pain.

175.     Defendants John Doe Lieutenants refused to loosen the restraints and refused to permit medical staff to do so, causing Mr. Richardson's pain to be prolonged.

176.     During this restraints placement, Defendants, including the John Doe Lieutenants, repeatedly told Mr. Richardson that he could only come out of restraints if he agreed to be celled with whomever they chose, regardless of whether the placement was dangerous.

177.     Defendants applied both hard "ambulatory" restraints and four-point restraints to Mr. Richardson for no legitimate reason, causing extreme pain and injuries, as described above.

178.     Defendants John Doe Lieutenants had the authority to release Mr. Richardson from restraints.  They were aware of his complaints of pain and were aware that he was not threatening harm or taking any other actions which would justify restraints.

179.     Despite this knowledge, Defendants John Doe Lieutenants refused to release Mr. Richardson from restraints and ignored his pleas for help.

180.     Defendants kept Mr. Richardson in hard restraints or four-point restraints for 17 days in unsanitary and inhumane conditions, as described above, in order to punish him for refusing to accept a dangerous cell assignment.

181.     Defendant Bledsoe authorized and approved of Mr. Richardson's placements in restraints, both "ambulatory" and four-point, from February 3, 2011 to March 2, 2011 and again from May 17, 2011 to June 2, 2011.

182.     Defendant Bledsoe ordered these restraints placements knowing and approving of the excessively tight manner in which the restraints were applied, the prolonged time period during which Mr. Richardson was subjected to the restraints, and the conditions in the cells in which Mr. Richardson was kept in restraints.

183.     Despite this knowledge, Defendant Bledsoe refused to take any actions to stop the harm being inflicted on Mr. Richardson and instead ordered that the abusive treatment be continued.

184.     Despite this knowledge, Defendant Bledsoe refused to order Mr. Richardson released from restraints, although he had the authority to do so.

185.     Defendant Norwood knew of and approved of the restraint practices at USP Lewisburg, including Mr. Richardson's placement in restraints, because he was regularly provided information, including reports, by staff at Lewisburg about the use of restraints.

186.    Defendants Trate, Snider, Hudson and Young ordered or knew of and acquiesced in the prolonged placements of Mr. Richardson in severely painful restraints in the unsanitary and inhumane conditions described above.

187.    As a direct and proximate result of the said acts of Defendants, Plaintiff Richardson suffered, and continues to suffer, the following injuries and damages:

      a.  Violation of his rights under the Fifth and Eighth Amendments to the United States Constitution;

      b.  Physical injuries;

      c.  Pain and suffering;

      d.  Emotional distress.

<u>Class Action Allegations</u>

188.   Pursuant to Rule 23(a), 23(b)(1) and 23(b)(2) of the Federal Rules of Civil Procedure, Plaintiff seeks relief on behalf of himself and a class of similarly situated individuals who are currently or will be imprisoned at the SMU at USP Lewisburg.

189.   Plaintiff seeks to represent a class defined as follows:  All persons who are currently or will be imprisoned in the SMU program at USP Lewisburg.  The class period commences from the time of this filing, and continues so long as USP Lewisburg Officials and Corrections Officers persist in the unconstitutional

patterns, practices, or policies of (1) placing hostile inmates together in cells or recreation cages, and enforcing this placement through the use of punitive restraints, and (2) failing to take any reasonable measures to protect the inmates from inmate-on-inmate violence.

190.   Because cell assignments are rotated periodically, and decisions about who should be placed in recreation cages together frequently change, every participant in the SMU program has been or is subject to the threat that he will be placed with a hostile inmate. Such placement creates a substantial risk that an inmate will be harmed at the hands of another inmate.

191.   Because all cell assignments are enforced via the threat of restraints should an inmate resist, every participant in the SMU program has been or is subject to the threat that restraints will be used against them punitively by USP Lewisburg officials or officers.

192.   Because USP Lewisburg officials and officers react to incidents inside a cell or recreation cage under the same pattern, practice or policy of non-intervention until the incident is over, every participant in the SMU program has been or is subject to the threat that officers will fail to intervene should a serious risk of substantial material harm arise while an inmate is being attacked by another inmate in a cell or recreation cage.

193.   Defendant the BOP is responsible for inmate safety at all USP institutions, including USP Lewisburg.  As such, the BOP is responsible for ensuring that the conditions of confinement in its facilities do not violate the Constitution.

194.   Defendants Kane, Norwood, Bledsoe, Young, and Hudson are responsible for creating and implementing policy at the BOP Institutions under their control, including USP Lewisburg.  As such, each Defendant has a responsibility to ensure that the conditions of confinement at USP Lewisburg do not violate the Constitution.

195.   Defendants Kane, Norwood, Bledsoe, Young, and Hudson were, at all times relevant to this complaint, aware of the conditions of confinement at USP Lewisburg by virtue of both the requirements of their positions and the inmate grievance process.

196.   The inmate grievance policy requires that grievances be reviewed first by Bledsoe, and if the grievance is denied, the inmate must then grieve to Norwood, and finally to Kane.

197.   Upon information and belief, hundreds of grievances have been filed in the last three years complaining of the conditions of confinement at USP Lewisburg, including Plaintiff's own grievances.

198.   Defendant Bledsoe, as Warden of USP Lewisburg, is informed as a matter of course of any inmate being placed in restraints or instances of inmate on inmate violence.

199.   Defendant Norwood, according to BOP policy, is sent notice of every occasion an inmate is restrained for longer than eight (8) hours or there is an instance of inmate on inmate violence.

200.   Defendants Bledsoe, Young, and Hudson are also aware of the day to day problems and incidents related to inmate placement at USP Lewisburg by virtue of their responsibility for inmate safety and institutional security.

201.   In overseeing and participating in inmate placement decisions, Defendants Bledsoe, Young, and Hudson are required to consider the past instances of inmate on inmate violence and placement refusals by inmates.

202.   Defendants Kane, Norwood, Bledsoe, Young, and Hudson are responsible for creating and implementing the policy at USP Lewisburg whereby inmates who refuse dangerous cell assignments with hostile inmates are placed in prolonged and painful restraints, as described above.

203.   The members of this Class are so numerous that joinder of all members is impracticable. Upon information and belief, there are approximately 1,363 inmates at USP Lewisburg, and an estimated 1,050 to 1,100 in the SMU program.

Additionally, it is impossible to determine which inmates currently housed in other Federal institutions may be transferred to USP Lewisburg in the future.

204.   Common questions of law and fact exist as to all members of the Class.  A class action is superior to other available methods for fair and efficient adjudication of the controversy.  A non-exclusive list of the questions of law and fact common to the Class include:  (1) whether there exists a pattern, practice or policy of placing hostile inmates together in cells or recreation cages; (2) whether the use of restraints in enforcing inmate placement decisions constitutes further conduct in violation of the Eighth Amendment; and (3) whether USP Lewisburg officials' failure to protect inmates from frequent and predictable inmate violence after forcing hostile inmates together in a cell or recreation cage amounts to an Eighth Amendment violation.

205.   Plaintiff's claims are typical of the class members, in that each member of the class has suffered, or will potentially suffer, harm as a result of the same acts or omission engaged in by Defendants.

206.   Plaintiff will fairly and adequately protect the interests of the members of the Class, and has retained counsel competent and experienced in class action and prisoners' civil rights litigation.  Plaintiff's counsel has the resources, expertise, and experience to prosecute this action against Defendants.  Plaintiff has no

interest hostile to or in conflict with those of the proposed class with respect to the claims raised in this complaint.

207.   Certification is warranted under Rule 23(b)(1)(A) because prosecuting separate actions for members of the Class would, as a practical matter, create a risk of inconsistent and varying adjudications with respect to individual class members. Individual adjudications may also substantially impede or impair other class members' ability to protect their interests.

208.   The Defendants have acted, or refuse to act, on grounds generally applicable to the class.  Final injunctive relief is appropriate with respect to all of the members of the class pursuant to Rule 23(b)(2).

## CAUSES OF ACTION

### Count I

Plaintiff Sebastian Richardson vs. Defendants Bledsoe, Young, Hudson, Trate, Snider, Fleming, Mattly, Carrasquilla, Saylor, Seaman, Seeba, Miller, Johnson, and Scampone

Eighth Amendment violation, pursuant to <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), for February 3, 2011 to March 2, 2011 restraints placement

209.   Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint.

210.   Plaintiff's right to be free from cruel and unusual punishment under the

Eighth Amendment to the United States Constitution was clearly established as of

February 3, 2011.

211.   Defendants, acting under color of federal law, deprived Plaintiff of his

constitutional right to be free from cruel and unusual punishment.

212.   Defendants Bledsoe, Young, Hudson, Trate, Snider, Fleming, Mattly,

Carrasquilla, Saylor, Seaman, Seeba, Johnson, and Scampone violated Plaintiff's

Eighth Amendment rights by their conduct as described above.

213.   Due to Defendants' acts and omissions, Plaintiff suffered serious bodily

injury and pain, and is therefore entitled to relief.

## Count II

Plaintiff Sebastian Richardson vs. Defendants Bledsoe, Young, Hudson, Trate,
Snider, Saylor, Fleming, Scampone, Seeba, Carrasquilla, Johnson, Whittaker, and
John Doe Lieutenants

Eighth Amendment Violation, pursuant to Bivens v. Six Unknown Named Agents
of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), for May 17, 2011 to June
2, 2011 Restraints Placement

214.   Plaintiff incorporates by reference the allegations in the preceding

paragraphs of this Complaint.

215.   Plaintiff's right to be free from cruel and unusual punishment under the

Eighth Amendment to the United States Constitution was clearly established as of

May 17, 2011.

216.   Defendants, acting under color of federal law, deprived Plaintiff of his

constitutional right to be free from cruel and unusual punishment.

217.   Defendants Bledsoe, Young, Hudson, Trate, Snider, Saylor, Fleming,

Scampone, Seeba, Carrasquilla, Johnson, Whittaker, and John Doe Lieutenants

violated Plaintiff's Eighth Amendment rights by their conduct, as described above,

218.   Due to Defendants' acts and omissions, Plaintiff suffered serious bodily

injury and pain, and is therefore entitled to relief.


## Count III

Plaintiff Sebastian Richardson vs. Defendants Bledsoe, Young, Hudson, Trate, Snider, Fleming, Mattly, Carrasquilla, Saylor, Seaman, Seeba, Miller, Johnson, and Scampone

Fifth Amendment violation, pursuant to Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), for February 3, 2011 to March 2, 2011 restraints placement

219.   Plaintiff incorporates by reference the allegations in the preceding

paragraphs of this Complaint.

220.   Plaintiff's right under the Fifth Amendment of the United States

Constitution to meaningful process in connection with a deprivation of liberty was

clearly established as of May 17, 2011.

221.   Defendants Bledsoe, Young, Hudson, Trate, Snider, Fleming, Mattly,

Carrasquilla, Saylor, Seaman, Seeba, Miller, Johnson, and Scampone violated

Plaintiff's Fifth Amendment rights by depriving him of any meaningful process prior to and during their use of punitive measures against him, including but not limited to, subjecting him to hard "ambulatory" restraints and four-point restraints from February 3, 2011 to March 2, 2011, and by taking those punitive measures in an arbitrary manner without any legitimate penological purpose.

222.   Due to Defendants' acts and omissions, Plaintiff suffered the injuries and damages described above, and is therefore entitled to relief.

### Count IV

Plaintiff Sebastian Richardson vs. Bledsoe, Young, Hudson, Trate, Snider, Saylor, Fleming, Scampone, Seeba, Carrasquilla, Johnson, Whittaker and John Doe Lieutenants

Fifth Amendment violation, pursuant to <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), for May 17, 2011 to June 2, 2011 restraints placement

223.   Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint.

224.   Plaintiff's right under the Fifth Amendment of the United States Constitution to meaningful process in connection with a deprivation of liberty was clearly established as of May 17, 2011.

225.    Defendants Bledsoe, Young, Hudson, Trate, Snider, Saylor, Fleming, Scampone, Seeba, Carrasquilla, Johnson, Whittaker and John Doe Lieutenants

violated Plaintiff's Fifth Amendment rights by depriving him of any meaningful process prior to and during their use of punitive measures against him, including but not limited to, subjecting him to hard "ambulatory" restraints and four-point restraints from May 17, 2011 to June 2, 2011, and by taking those punitive measures in an arbitrary manner without any legitimate penological purpose.

226.    Due to Defendants' acts and omissions, Plaintiff suffered the injuries and damages described above, and is therefore entitled to relief.


## Count V

Class vs. Defendants Kane, Norwood, Bledsoe, Young, and Hudson

Eighth Amendment Violation

227.   Plaintiff asserts this claim on behalf of himself and a class of all similarly situated inmates at USP Lewisburg, as described in Paragraph 189.

228.   Plaintiff incorporates by reference as if fully set forth herein the allegations contained in this Complaint.

229.   Plaintiff and the class members have a right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.  This means that prison officials must protect prisoners from excessive risks of substantial material harm.

230.   Defendants, acting under color of federal law, engaged in a pattern, practice or policy of placing hostile inmates together in cells and/or recreational cages despite the substantial risk that the hostile inmates would cause significant harm to each other, and enforcing this pattern, practice or policy through the threat and use of punitive restraints.  Furthermore, Defendants, again acting under the color of federal law, engaged in a pattern, practice or policy of failing to intervene to protect inmates from predictable harm at the hands of hostile inmates, with whom the inmates were placed by Defendants.  Thus, Defendants have deprived the members of the class of their constitutional rights to be free from cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution, and will continue to do so unless their patterns, practices and policies are changed.  If appropriate declaratory and injunction relief is not granted, the harms suffered will be irreparable, may lead to death, and will continue for the foreseeable future.

231.   Defendants' acts and omissions have caused and will continue to cause serious bodily injury to Plaintiff and every other inmate housed at USP Lewisburg, currently or in the future, and therefore the class is entitled to injunctive relief.

**Count VI**

Class vs. Defendants Kane, Norwood, Bledsoe, Young, and Hudson

Fifth Amendment violation

232.   Plaintiff asserts this claim on behalf of himself and a class of all similarly situated inmates at USP Lewisburg, as described in Paragraph 189.

233.   Plaintiff incorporates by reference as if fully set forth herein the allegations contained in this Complaint.

234.   Plaintiff and the class members have a right to meaningful process in connection with any deprivation of their liberty, pursuant to the Fifth Amendment to the United States Constitution.

235.   Defendants, acting under color of federal law, engaged in a pattern, practice or policy of denying inmates meaningful process in connection with their placement in punitive restraints, by ordering that falsified documents be prepared and submitted by USP Lewisburg staff in order to justify these placements and by maintaining and using a system whereby the use of prolonged, punitive restraints cannot be effectively challenged by inmates through the disciplinary process. Thus, Defendants have deprived the members of the class of their constitutional right to have meaningful process in connection with a deprivation of their liberty in violation of the Fifth Amendment to the United States Constitution, and will continue to do so unless their patterns, practices and policies are changed.  If appropriate declaratory and injunction relief is not granted, the harms suffered will be irreparable, may lead to death, and will continue for the foreseeable future.

236.   Defendants' acts and omissions have caused and will continue to cause serious bodily injury to Plaintiff and every other inmate housed at USP Lewisburg, currently or in the future, and therefore the class is entitled to injunctive relief.

## **Prayer for Relief**

WHEREFORE, Plaintiff prays as follows:

1.   That Defendants be adjudged to have violated Plaintiff's rights under the Fifth and Eighth Amendments to the United States Constitution;

2.   That judgment be entered for Plaintiff against Defendants Bledsoe, Young, Hudson, Trate, Snider, Fleming, Mattly, Carrasquilla, Saylor, Seaman, Seeba, Miller, Johnson, Scampone, and John Doe Lieutenants, in their individual capacities, for compensatory and punitive damages, together with the costs of litigation, including reasonable attorneys' fees;

3.   That this action be certified under Federal Rule of Civil Procedure 23(b)(2);

4.   That Defendants be adjudged to have violated the class members' rights under the Fifth and Eighth Amendment to the United States Constitution;

5.   That the Court issue an injunction preventing Defendants from continuing their unconstitutional housing, recreation, and restraint patterns, practices and policies; and,

6.   That the Court award any such other and further relief deemed appropriate.

Respectfully Submitted,

PENNSYLVANIA INSTITUTIONAL
LAW PROJECT

/s/ Jennifer J. Tobin
Jennifer J. Tobin
Attorney I.D. No. PA 202047
718 Arch Street, Ste. 304 South
Philadelphia, PA  19106
Tel:   215-925-2966
Fax:  215-925-5337
E:      jtobin@pailp.org

/s/ Marybeth Walsh
Marybeth Walsh
Attorney I.D. No. PA 203765
429 Forbes Ave., Ste. 800
Pittsburgh, PA  15219
Tel:   412-434-6175
Fax:  412-434-5706
E:      mwalsh@pailp.org

DECHERT LLP

Stephen D. Brown
Christine C. Levin
Jennifer L. Burdick
Francis J. Dermody
Sean P. McConnell
Dechert LLP
Cira Centre
2929 Arch St.
Philadelphia, PA 19104
215-994-4000

*Attorneys for Plaintiff Sebastian Richardson*

Dated:  December 7, 2011