UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

SEBASTIAN RICHARDSON,                :
                                     :
          Plaintiff                  :   No. 3:CV-11-2266
                                     :
     vs.                             :   (Judge Nealon)
                                     :
THOMAS R. KANE, et al.,              :
                                     :
          Defendants                 :

**FILED
SCRANTON**

APR - 9 2013

PER _____ ~m̃ ~ᴸ ᴶ⁄
DEPUTY CLERK

## MEMORANDUM

On December 7, 2011, Sebastian Richardson, an inmate confined in the United States

Penitentiary, Lewisburg ("USP-Lewisburg"), Pennsylvania, filed the above captioned Bivens[1]

action and class action lawsuit.  Named as Defendants are the following seventeen (17), current and

former, employees of the Bureau of Prisons ("BOP"): Thomas Kane, Acting Director of BOP;

Joseph Norwood, Regional Director of the Northeast Region; Bryan A. Bledsoe, Warden; David

Young, Associate Warden; Donald Hudson, Associate Warden; Bradley Trate, Captain; Sean

Snider, Deputy Captain; and Lieutenants Scampone, Fleming, Carrasquillo, Saylor, Mattingly,

Sassaman, Seeba, Miller, Johnson, and Whittaker.

Richardson seeks damages and injunctive relief for claims of excessive use of force and

conditions of confinement in violation of the Eighth Amendment, alleging Defendants punished

him for rejecting dangerous cell assignments by placing him in painfully tight metallic restraints for

weeks at a time.  (Doc. 21, Amended Complaint).  Plaintiff alleges that the restraints were purely

punitive, as he posed no security threat to anyone.  Id.

---

1. Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 397 (1971).

Additionally, Richardson asserts class claims for injunctive relief on behalf of all current and future prisoners in the Special Management Unit (SMU), pursuant to Federal Rules of Civil Procedure 23, for the unconstitutional and unconscionable conditions of confinement that Plaintiff, individually, and all inmates collectively, must endure on a day-to-day basis. Id. Specifically, Plaintiff alleges that Defendants place "hostile" inmates together in cells and/or recreation cages with the knowledge that they will harm each other, Defendants improperly use restraints to force inmates to cell together, and when the cellmates fight, Defendants will not intervene. Id. Richardson seeks to represent a class of inmates that would allege similar violations. Id. Finally, Richardson sues the United States under the FTCA. Id.

Presently before the Court is Plaintiff's motion to dismiss or, in the alternative, for a more definite statement. (Doc. 24). For the reasons set forth below the Court will grant, in part, Defendants' motion to dismiss, and deny Defendants' motion for a more definite statement.

## I.  Class Certification

Pursuant to Federal Rule of Civil Procedure 23, Plaintiff moves for an order certifying a class consisting of all persons who are currently, or will be, imprisoned in the Special Management Unit ("SMU") at USP-Lewisburg. (Doc. 21, Amended Complaint at ¶ 188). Plaintiff states that the class period commences from the filing of the above-captioned action and continues so long as USP-Lewisburg officials and corrections officers persist in the unconstitutional policy of placing hostile inmates in double cells or recreational cages without taking any reasonable measures to protect the inmates from inmate-on-inmate violence, and using punitive restraints to enforce this policy. Id.

Plaintiff alleges that in 2008, the Bureau of Prisons created an SMU program at USP-

-2-

Lewisburg. Id. at ¶ 15. The SMU program is meant to serve inmates who present "unique security management: concerns including inmates who have a history of violence" or who "participated in or had leadership roles in geographical groups/gang related activity." U.S. Dept. of Justice, Program Statement: Special Management Units § 1.

Plaintiff alleges that the SMU cells were originally designed to hold one person, however, the amount of space available to inmates is limited by the pattern, practice or policy of forcing SMU members to take cellmates. Id. at ¶ 18.

Plaintiff claims that upon entering the SMU program at USP-Lewisburg, inmates participate in an intake interview with USP-Lewisburg officials, often referred to as a "Quay" hearing. Id. at ¶ 25. The Quay hearing serves as an opportunity for Defendants to gather information about the inmate so that the prison officials can make safe and appropriate placement decisions, and avoid placing hostile inmates together. Id. at ¶ 26. At this interview, inmates disclose their separation needs and known enemies and identify specific geographic groups or gangs with whom an inmate has problems. Id. at 27.

Following the Quay hearing, a Cell Assignment Committee[2], with the assistance of corrections officers on each block, assigns each inmate to a cell block and a specific cell. Id. at ¶ 28. The Cell Assignment Committee is responsible for considering the inmate's safety when making placement decisions. Id. at ¶ 31. Once settled at USP-Lewisburg, inmates frequently update Corrections Officers orally or in writing of new inmate adversaries, or geographic groups or gangs that they believe pose a substantial risk of material harm to them. Id. at ¶ 34.

---

[2]Relative to Plaintiff's case, the Committee included Defendants Bledsoe, Trate, Young and Hudson. Id. at ¶ 29.

Inmates are rotated to new cells every twenty-one (21) days. Id. at ¶ 37. During this rotation, inmates sometimes receive new cellmates. Id. Inmates also receive new cellmate assignments if their cellmate leaves the SMU, either by completing the SMU "program" or by some other method. Id. Thus, this rotation renews the potential for an inmate to be placed with a hostile inmate. Id. at ¶ 38. Plaintiff alleges that there have been at least 272 reported incidents of inmate-on-inmate violence at Lewisburg from 2008 until July 2011. Id. at ¶ 40. To exacerbate the situation, inmates are unable to avoid inappropriate placements because Defendants enforce their policy by placing those who refuse to be celled with a hostile inmate into painful and confining restraints. Id. at ¶¶ 42-43.

Plaintiff contends that Defendants persist in the unconstitutional patterns, practices, and policies of: (1) placing hostile inmates together in cells or recreations cages, and enforcing this placement through use of punitive restraints, and (2) failing to take any reasonable measures to protect the inmates from inmate-on-inmate violence. Id. at ¶ 188. As such, Plaintiff seeks to have a class certified to challenge the constitutionality of the unlawful policies or practices employed at USP-Lewisburg. Id.

## II.    Certification Under Rule 23(a)

The class-action device is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Califano v. Yam asaki, 442 U.S. 682, 700–01 (1979). Class relief is "peculiarly appropriate" when the "issues involved are common to the class as a whole" and when they "turn on questions of law applicable in the same manner to each member of the class." Id. at 701. It is appropriate in cases where it "saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be

litigated in an economical fashion under Rule 23." Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 155 (1982) (quoting Califano, 442 U.S. at 701).

Class certification is proper only if the trial court is satisfied that the prerequisites of Rule 23 are met. See In re Hydrogen Peroxide Antitrust Litigation, 552 F.3d 305, 309 (3d Cir. 2008) (citing Gen Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161(1982)). To meet the prerequisites of Rule 23, a plaintiff must establish both that the four requirements of Rule 23(a) have been met—numerosity, commonality, typicality, and adequacy—and that the pleading requirements of Rule 23(b)(1), (2), or (3) have been met. See generally FED. R. CIV. P. 23. The plaintiff bears this burden by a preponderance of the evidence. See Hydrogen Peroxide, 552 F.3d at 320. In analyzing whether Rule 23's requirements have been met, the Court makes the factual and legal inquiries necessary and considers all relevant evidence and arguments presented by the parties. Id. at 307.

A threshold requirement to a Rule 23 action is the actual existence of a class which is sufficiently definite and identifiable. See Kline v. Sec. Guards, Inc., 196 F.R.D. 261, 266 (E.D. Pa. 2000); Reilly v. Gould, Inc., 965 F. Supp. 588, 596 (M.D. Pa. 1997); Clay v. Am. Tobacco Co., 188 F.R.D. 483 (S.D. Ill. 1999). The initial inquiry on class definition is distinct from the analysis required by Federal Rule of Civil Procedure 23. See Sanneman v. Chrysler Corp., 191 F.R.D. 441, 446 n.8 (E.D. Pa. 2000).

The four prerequisites to a class action, under Federal Rule of Civil Procedure 23(a), are: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. As a shorthand, courts regularly refer to the prerequisites as

-5-

numerosity, commonality, typicality, and adequacy of representation. See, e.g., In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 527 (3d Cir. 2004); Georgine v. Amchem Prods., Inc., 83 F.3d 610, 624 (3d Cir .1996), aff'd sub nom. Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997). All four Rule 23(a) prerequisites for class certification serve as "guideposts for determining whether maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Am chem, 521 U.S. at 626.

Here, Plaintiff's proposed class consists of all persons who are currently or will be imprisoned in the Special Management Unit ("SMU") at USP-Lewisburg, pursuant to the unconstitutional policy of placing hostile inmates in double cells or recreational cages without taking any reasonable measures to protect the inmates from inmate-on-inmate violence, and using punitive restraints to enforce this policy. This class definition is untenable because it is not objectively, reasonably ascertainable.

As noted above, "[c]lass certification presupposes the existence of an actual 'class'." White v. Williams, 208 F.R.D. 123, 129 (D.N.J. 2002) (quoting In re Sch. Asbestos Litig., 56 F.3d 515, 519 (3d Cir. 1995)). A "proposed class must be sufficiently identifiable" and it must be "administratively feasible to determine whether a given individual is a member of the class." Id. (quoting Mueller v. CBS, Inc., 200 F.R.D. 227, 233 (W.D. Pa. 2001)). See also Kline v. Sec. Guards, Inc., 196 F.R.D. 261, 266 (E.D. Pa. 2000) (holding that plaintiffs must minimally define the class "in a way that enables the court to determine whether an individual is a class member"). This consideration necessitates that class membership be defined in an "objective manner." See Kemblesville HHMO Center, L LC v. Landhope Realty Co., 2011 WL 3240779, *4 (E.D. Pa. 2011)

(quoting <u>Rowe v. E .I. Dupont De Nemours & Co.</u>, 262 F.R.D. 451, 455 (D.N.J. 2009) (citing

<u>Bentley v. Honeywell Int'l Inc.</u>, 223 F.R.D. 471, 477 (S.D. Ohio 2004)).

   Thus, certification is denied when determining membership in the class essentially requires

a mini-hearing as to each prospective class member. <u>Id.</u> (citing <u>Agostino v. Quest Diagnostics Inc.</u>,

256 F.R.D. 437, 478 (D.N.J. 2009) (citing <u>Forman v. Data Transfer, Inc.</u>, 164 F.R.D. 400, 403

(E.D. Pa. 1995)). <u>See also</u> <u>Mann v. TD Bank, N.A.</u>, 2010 WL 4226526, *1 (D.N.J. 2010)

(concluding putative class ran afoul of requirement that it "be reasonably ascertainable" where

court "would have to hear anecdotal evidence from each prospective class member" to determine

membership under proposed definition); <u>Kondratick v. Beneficial Consumer Disc. Co.</u>, 2006 WL

305399, *7 (E.D. Pa. 2006) (holding that "[t]o determine if an individual is a class member, a court

must be able to do so by reference to the class definition"); <u>Solo v. Bausch & Lomb Inc.</u>, 2009 WL

4287706 (D.S.C. 2009) (class not appropriate for certification where determining class membership

would require "fact-intensive mini-trials").[3]

   Moreover, Courts have denied certification where the putative class "contains members

lacking Article III standing," thus requiring any putative class to be "defined in such a way that

anyone within it would have standing." <u>Denney v. Deutsche Bank AG</u>, 443 F.3d 253, 264 (2d Cir.

---

   [3]<u>See also</u> <u>Allen–Wright v. Allstate Ins. Co.</u>, 2008 WL 5336701 (E.D. Pa. 2008) (identifying problems with a class definition that required case-by-case factual determination); <u>Forman v. Data Transfer, Inc.</u>, 164 F.R.D. 400, 403 (E.D. Pa. 1995) (same).
   The Court does proceed to resolve factual or legal disputes relevant to class certification, even when there is "[a]n overlap between a class certification requirement and the merits of a claim." <u>Hydrogen Peroxide</u>, 552 F.3d at 316, 318 (cited in <u>In re Schering Plough Corp. ERISA Litigation</u>, 589 F.3d 585, 600 (3d Cir. 2009)). Under this class definition, however, the contemplated threshold determinations involve numerous potentially disparate merits-based inquiries, and—as noted above—the duty of the Court to make threshold legal and factual determinations to decide class certification does not extend so far.

2006) (affirming the denial of a plaintiff class because the definition of the class was "so amorphous and diverse" that it was not "reasonably clear that the proposed class members have all suffered a constitutional or statutory violation warranting some relief") (citing Adashunas v. Negley, 626 F.2d 600, 604 (7th Cir. 1980)); Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289, 334 (S.D. N.Y. 2003) (noting that "each member of the class must have standing with respect to injuries suffered as a result of defendants' actions").

Courts likewise have held that a class definition is overly broad where the class encompassed persons who had not suffered any injury. See Owen v. Regence Bluecross Blueshield, 388 F. Supp. 2d 1318, 1334 (D. Utah 2005) ("[T]he proposed definition of the class is overbroad because many of the proposed class members have suffered no damages."); Zapka v. Coca-Cola Co., 2000 WL 1644539, *3 (N.D. Ill. 2000) (holding class definition improper where it included individuals who were not harmed); Canady v. Allstate Ins. Co., 1997 WL 33384270 (W.D. Mo. 1997) ("Because the court cannot accept plaintiffs' blanket contention that every member of the proposed broad class has allegedly suffered harm as a result of the defendants' wrongdoing, the court must find that the class definition is overbroad.").

Even where all class members have been injured, a class definition may be overly broad if the question of liability is specific to each class member. For example, in Holmes v. Pension Plan of Bethlehem Steel Corp., 213 F.3d 124 (3d Cir. 2000), the Court of Appeals affirmed the district court's finding that the class definition was overly broad because the determination of actual liability with respect to any class member would require an individualized inquiry into the equities of each claim. Id. at 137-38.

-8-

Here, the Court notes, initially, that Plaintiff's request to certify a class consisting of all persons who are currently or will be imprisoned in the SMU at USP-Lewisburg, is over broad as it clearly encompasses persons who have not suffered any injury.  Plaintiff alleges, and Defendants do not dispute, that there are approximately 1,363 inmates at USP-Lewisburg, and 1050 to 1,100 in the SMU program. (Doc. 21, Amended Complaint at ¶ 202).  Plaintiff's numbers or estimates, however, do not distinguish between inmates with hostile cell mates and inmates without hostile cell mates.  As such, the proposed definition is amorphous and vague.  Plaintiff fares no better in breaking the class down into subclasses according to the specific harm alleged.

To the extent that Plaintiff seeks to certify a class based on inmates housed pursuant to a policy of housing inmates with a "hostile" inmate, the determination of class membership under this definition would require this Court to adjudicate, on a person-by-person basis, whether each proposed class member was placed with an inmate that prison officials knew, or should have known, posed a threat to that inmate.[4]  That is, class membership would not be ascertainable without the imposition of "serious administrative burdens incongruous with the efficiencies expected in a class action." Sanneman v. Chrysler Corp., 191 F.R.D. 441, 446 (E.D. Pa. 2000) (concluding certification inappropriate where determining class membership would create such burdens).  Plaintiff attempts to define the class by stating that "from 2008 until July 2011, there

_____

[4]The underlying Constitutional analysis for membership in the class is pursuant to the Eighth Amendment prohibition of cruel and unusual punishment.  To succeed on such an Eighth Amendment claim, a prisoner must show that: (1) he was incarcerated under conditions posing a substantial risk of serious harm; (2) the defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists"; (3) the defendant actually drew this inference; and (4) the defendant deliberately disregarded the apparent risk. Farmer v. Brennan, 511 U.S. 825, 828 (1994) (quoting Wilson v Seiter, 501 U.S. 294, 297, 302-03(1991); Hudson v. McMillian, 503 U.S. 1, 5 (1992)).

have been 272 reported incidents of inmate on inmate violence". (Doc. 21, ¶ 40). However, this statement, in addition to being unsubstantiated, fails to identify if these incidents were solely confined to the SMU or elsewhere within USP-Lewisburg. Furthermore, Plaintiff seeks to certify the class as "all persons who are **currently or will be imprisoned** in the SMU at USP-Lewisburg, with the class period commencing from the filing of the above captioned action". (Doc. 21) (emphasis added). Thus, the 272 incidents Plaintiff references are outside the time period for the proposed class.

To the extent that Plaintiff seeks to certify a class based on inmates who, pursuant to a prison practice, are placed in painful punitive restraints for refusing a dangerous cell assignment, Plaintiff again seeks to certify a class that would require a very fact specific inquiry as to its membership. Once again, class membership would depend on a determination as to if a class member is presented with a hostile inmate and refuses, and if the class member was then improperly placed in some type of restraint as a result of his refusal, and was injured by the use of the restraints. "If the court is required to conduct individual inquiries to determine whether each potential class member falls within the class, the court should deny certification." Ramirez v. Palisades Collection, LLC, 250 F.R.D. 366, 369 (N.D. Ill. 2008).

Because it would be impossible to definitively identify class members prior to individualized fact-finding and litigation, the Court need not consider whether the class meets the requirements of Rule 23(a) and 23(b). Thus, the Court declines to certify the proposed class.

**III. Motion to Dismiss**

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." Under Rule 12(b)(6), the court must "accept all

factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)).  While a complaint need only contain "a short and plain statement of the claim," FED. R. CIV. P. 8(a)(2), and detailed factual allegations are not required, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Id. at 570.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662 (2009) (quoting Twombly, 550 U.S. at 556).  "[L]abels and conclusions" are not enough, Twombly, 550 U.S. at 555, and a court "'is not bound to accept as true a legal conclusion couched as a factual allegation.'" Id. (quoted case omitted).  Thus, "a judicial conspiracy claim must include at least a discernible factual basis to survive a Rule 12(b)(6) dismissal." Capogrosso v. The Supreme Court of New Jersey, 588 F.3d 180, 184 (3d Cir. 2009) (per curiam).

In resolving the motion to dismiss, the court must "conduct a two-part analysis." Fowler, 578 F.3d at 210.  First, the court separates the factual elements from the legal elements and disregards the legal conclusions. Id. at 210-11.  Second, the court must "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a " 'plausible claim for relief.'" Id. at 211 (quoted case omitted).

In addition, because Plaintiff complains about "prison conditions," the screening provisions of 42 U.S.C. § 1997e apply, as do the screening provisions of 28 U.S.C. § 1915(e), given that he was granted in forma pauperis status to pursue this suit.  The court's obligation to dismiss a

complaint under the PLRA screening provisions for complaints that fail to state a claim is not excused even after defendants have filed a motion to dismiss. See Lopez v. Smith, 203 F.3d 1122, 1126 n.6 (9th Cir. 2000). Hence, if there is a ground for dismissal which was not relied upon by a defendant in a motion to dismiss, the court may nonetheless sua sponte rest its dismissal upon such ground pursuant to the screening provisions of the PLRA. See id;; Dare v. U.S., 2007 WL 1811198, *4 (W.D. Pa. 2007), aff'd, 264 Fed Appx. 183 (3d Cir. 2008).

### A. **Allegations in Complaint**

Plaintiff arrived at USP-Lewisburg in March, 2010 to participate in the SMU program. (Doc. 21, Amended Complaint at ¶ 87). When he arrived, during his Quay hearing, Plaintiff told Lewisburg staff which categories of inmates he could not safely be celled with. Id. at ¶ 88.

After his arrival in 2010, Plaintiff was celled with a compatible inmate. Id. at ¶ 90. This compatible cell pairing lasted for approximately seven (7) months until Defendants moved that inmate out of Plaintiff's cell. Id. at ¶ 91.

On February 3, 2011, corrections staff asked Plaintiff to "cuff up" to accept a cellmate known as "the Prophet". Id. at ¶ 92. Plaintiff knew that "the Prophet" had a highly assaultive reputation and had attacked over 20 former cellmates. Id. at ¶ 93. Defendants knew about these assaults as well, as many had occurred at USP-Lewisburg. Id. at ¶ 94. When "the Prophet" was brought to Plaintiff's cell, he had just been released from hard restraints, which he had been placed in for refusing a cellmate and he was rocking back and forth in agitation as he waited outside Plaintiff's cell door. Id. at ¶ 95. Due to his fear of assault, Plaintiff refused to cuff up to accept the hostile inmate as a cellmate. Id. at ¶ 96. Corrections staff asked Plaintiff if he was refusing a cellmate, and he replied that he was. Id. at ¶ 97. Staff then took "the Prophet" away. Id. at ¶ 98.

-12-

Approximately thirty (30) minutes later, Defendant Fleming led a Use of Force team to Plaintiff's cell. Id. at ¶ 99.  The team asked him if he would submit to restraints, and he replied that he would. Id.  Plaintiff agreed to go with them and did not resist or refuse any of their instructions. Id.  The Use of Force team took Plaintiff to a laundry area where he was stripped, put into paper clothes, and placed into hard restraints. Id. at ¶ 100.  The team members put the restraints on so tightly that as they were applied, Plaintiff reflexively began screaming in pain. Id. at ¶ 101.  As part of the restraints, the team also applied the chain so tightly around Plaintiff's chest that it caused pain and interfered with his breathing. Id. at ¶ 102.  The team applied metal shackles to Plaintiff's ankles. Id. at ¶ 103.  The shackles were applied so tightly that they cut into Plaintiff's Achilles tendon and ankle. Id.  This made walking very painful and any normal flexing of the foot causes the shackles to cut further in to the Achilles tendon. Id.  Plaintiff was then taken from the laundry area to a cell and placed with a cellmate who was also in hard restraints. Id. at ¶ 104.  The window in the cell was open, even though it was February and very cold. Id.

Three days later, on or about February 6, 2011, Plaintiff was moved to a different cell and placed with another inmate who was also in restraints. Id. at ¶ 105.  The other inmate was pleading for help because of the pain caused by the restraints. Id.  He stated that he could not breath because of the chest pain and he could not feel his hands because of the tight handcuffs. Id.

On February 10, 2011, Plaintiff was put in four-point restraints. Id. at ¶ 106.  Defendant Bledsoe authorized the application of four-point restraints on Plaintiff. Id. at ¶ 107.  Plaintiff screamed out in pain when the four-point restraints were applied, as his arms and legs were pulled away from his body by means of tightly cuffed metal handcuffs and shackles attaching his wrists and ankles to points on the bed frame. Id. at ¶ 108.  While in four-point restraints, Plaintiff asked

-13-

for water and for a urinal. Id. at ¶ 109.  He was denied both by Lieutenants, including Defendant Scampone, who came in to check on his restraints. Id.  As a result, while restrained to the bed, Plaintiff urinated on himself and was left in soiled paper clothing. Id. at ¶ 110.  During this time period, Defendant Scampone opened the window in Plaintiff's cell. Id. at ¶ 111.  Plaintiff suffered due to the cold air coming in through the open window. Id. at ¶ 112.  Plaintiff spent over eight (8) hours in four-point restraints that painfully stretched body and caused pain to his ankles and wrists. Id. at ¶ 113.  Approximately eight (8) hours later, Plaintiff was taken out of four-point restraints and put back in hard "ambulatory" restraints. Id. at ¶ 114.  He remained in hard restraints from February 10 to February 23, 2011 in the cell conditions described above. Id.

On February 23, 2011, Defendants took Plaintiff out of restraints for approximately two (2) hours and he was given a shower, the first in weeks. Id. at ¶ 115.  After the shower, Defendants again tried to force Plaintiff into a dangerous cellmate assignment. Id. at ¶ 116.  Plaintiff refused and was immediately put back into hard restraints. Id. at ¶ 117.  Defendant Fleming told Plaintiff that because he had been out of restraints for approximately two (2) hours, they could "start him time over' in restraints, or words to that effect. Id. at ¶ 118.  In this manner, Defendants were able to keep Plaintiff in hard restraints for longer period of time than permitted under BOP policy. Id. at ¶ 119.

Under BOP policy, staff must regularly check on the placement of an inmate's restraints. The Lieutenant is also supposed to determine whether the inmate should remain in restraints or whether he should be released. Id. at ¶ 120.  The inmate's health is supposed to be checked during a "restraint check."  At USP-Lewisburg, however, medical and custody staff routinely ignore inmates' complaints of pain and other medical problems caused by right restraints. Id.

-14-

Defendants Mattingly, Carrasquillo, Fleming, Saylor, Sassaman, Seeba, Miller, and Johnson conducted checks on Plaintiff during this restraints placement and would either enter the cell along with medical staff for the "restraint checks," or, as was often the case, would walk by the cell with medical staff without entering the cell. Id. at ¶ 121. Plaintiff told each of these Defendants that the restraints were too tight and were causing him severe pain. Id. at ¶ 122. He would plead with each of these Defendants to loosen the restraints and would plead for a bathroom break. Id. Defendants Mattingly, Carrasquillo, Fleming, Saylor, Sassaman, Seeba, Miller, and Johnson routinely denied these requests, causing Plaintiff to remain in extremely painful restraints with his paper clothing soiled by his own waste. Id. at ¶ 123. Defendants Mattingly, Carrasquillo, Fleming, Saylor, Sassaman, Seeba, Miller, and Johnson were aware of Plaintiff's complaints of pain and were aware that he was not threatening harm or taking any other actions which would justify restraints, yet, despite this knowledge and having the authority to release Plaintiff from restraints, these Defendants refused to release Plaintiff from the restraints and ignored his pleas for help. Id. at ¶¶ 124, 125. Plaintiff also requested help from the medical staff during the "medical checks", however, the medical staff would tell him that they were not able to assist him, or they would "falsely record these interactions in [Plaintiff's] medical records." Id. at ¶¶ 126, 127.

During the "restraint checks", and at other times, Defendants repeatedly asked Plaintiff if he was ready to accept any cellmate they put him with, so that he could be let out of restraints. Id. at ¶ 129. Defendants Trate and Snider told Plaintiff that the only way out of restraints was to accept any cellmate they chose for him, hostile or not. Id. at ¶ 130. When Plaintiff offered to identify compatible inmates he could cell with, who were currently at the institution, Defendants Trate and Snider told him that the Warden, Defendant Bledsoe, would not accept that as a solution and that

the only way out of restraints was to accept any cellmate he was given. Id. at ¶ 131.  When Plaintiff complained to Defendant Young about the use of painful restraints as punishment for refusing dangerous cellmates and about his injuries from the restraints, Defendant Young responded that "this is what we have to do here," and that this practice would not change. Id. at ¶ 132.

Plaintiff was in hard "ambulatory" restraints for approximately fifteen (15) days before he received a toothbrush and toothpaste. Id. at ¶ 135.  He was forced to sleep on the floor approximately 50% of the time, in unsanitary conditions, and was refused a bathroom break for the majority of the time during this twenty-eight (28) day period, forcing him to attempt, painfully, to use the toilet while in restraints.[5] Id. at ¶¶ 136, 137.  During this period, Plaintiff had approximately fifteen (15) different cellmates, each of them also in hard restraints applied in the same painful and torturous manner. Id. at ¶ 139.

After being released from restraints on March 2, 2011, Plaintiff was celled with a compatible cellmate. Id. at ¶ 142.  This inmate had been at USP-Lewisburg the entire time Plaintiff had been in restraints. Id.  When that cellmate advanced to the next step in the SMU program, he was moved out of Plaintiff's cell. Id. at ¶ 143. Defendants then brought an inmate to Plaintiff's cell who suffered from mental illness and needed medication to control his behavior. Id. at ¶ 144. That inmate told Plaintiff he would be alright as long as he received his medications. Id. at ¶ 145. Defendants knew that this inmate needed medication and he had been receiving them up to that point at USP-Lewisburg. Id. at ¶ 146. The day after he was placed in Plaintiff's cell, the medical staff failed to bring the inmate his medications. Id. at ¶ 147. Both Plaintiff and his cellmate

---

[5]Because of the tight handcuffs and the position of the hands in front of the body, attached lightly to each other and the upper chest, it is incredibly painful to the inmate's hands, wrists, and arms to try to use the toilet. Id. at ¶ 76.

notified staff repeatedly that the cellmate needed his medications, but staff refused to respond and the inmate continued to go without his medications. Id. at ¶ 148. Without his medications, the inmate's behavior quickly became erratic and threatening. Id. at ¶ 149. He would stay awake at night, talking in different voices and acting strangely. Id. Plaintiff became fearful of his behavior. Id. Plaintiff remained celled with this inmate for approximately seven (7) days, his fear and anxiety increasing. Id. at ¶ 150. During this time period, staff would walk by the cell door and peer in the window. Id. at ¶ 151. Eventually the inmate was moved out of the cell and put into a single cell. Id. at ¶ 152. Plaintiff later learned that the Use of Force team had been "ready to go" at the time that he inmate had been brought to his cell, implying that Defendants' had expected Plaintiff to refuse him. Id. at ¶ 153.

On May 17, 2011, Corrections staff brought an unknown inmate to Plaintiff's cell and told him to cuff up in order to accept him as a cellmate. Id. at ¶ 156. After the recent attempts by Defendants to place hostile cellmates with him and the threat to force another hostile cell assignment on Plaintiff, Plaintiff no longer trusted any of the cellmate assignments and therefore refused this cell assignment. Id. at ¶ 157. As with the earlier incident, a "Use of Force" team was assembled and brought to Plaintiff's cell on May 17, 2011. Id. at ¶ 158. The "team", led by Defendants Saylor and Fleming, put Plaintiff into hard restraints. Id. at ¶ 159. Plaintiff submitted to the restraints and complied with the orders of the "team", offering no resistance. Id. The hard restraints were placed on Plaintiff in the same tight manner as before, causing severe pain and swelling. Id. at ¶ 160. Plaintiff was then kept in the small unsanitary restraints room with extremely limited ability to eat, drink, toilet, and sleep. Id. at ¶ 161. At one point during this restraints placement, Defendant Scampone twisted Plaintiff's handcuffs even tighter, causing more

-17-

pain and told him that he would let Plaintiff out of the restraints if he would comply and go wherever they put him. Id. at ¶ 162. Plaintiff responded that he would only accept a cell assignment that was safe for him. Id. at ¶ 163. Defendant Whittaker made similar threats to Plaintiff and told him that he would be taken out of restraints by "the team" so that he could then be put back into restraints and his time would "start over." Id. at ¶ 164.

On May 31, 2011, Plaintiff was put into four-point restraints by Lt. Carrasquillo and a "Use of Force" team. Id. at ¶ 168. Defendant Bledsoe authorized the application of four-point restraints on Plaintiff. Id. at ¶ 169. Defendants kept Plaintiff in four-point restraints from May 31, 2011, until June 1, 2011. Id. at ¶ 170. During this time period, Defendant Johnson denied Plaintiff a bathroom break, which resulted in him urinating on himself and remaining his soiled clothing for hours. Id. at ¶ 171. Defendants took Richardson out of four-points and put him back into hard "ambulatory" restraints on June 1, 2011, where he remained for one more day. Id. at ¶ 172.

As with the earlier restraints placement, Plaintiff pleaded with and complained to the Lieutenants who accompanied medical staff during the "restraint checks," including Defendants Carrasquillo, Fleming, Johnson, Mattingly, Miller, Saylor, Scampone, Seeba, and Whittaker, and at other times, that the restraints were too tight and were causing him severe pain. Id. at ¶ 173. The Lieutenants, including Defendants Carrasquillo, Fleming, Johnson, Mattingly, Miller, Saylor, Scampone, Seeba, and Whittaker refused to loosen the restraints and refused to permit medical staff to do so, causing Plaintiff's pain to be prolonged. Id. at ¶ 174. During this restraints placement, Defendants repeatedly told Plaintiff that he could only come out of restraints if he agreed to be celled with whomever they chose, regardless of whether the placement was dangerous. Id. at ¶ 175.

-18-

On December 7, 2011, Plaintiff filed the instant action. He claims that Defendants Carrasquillo, Fleming, Johnson, Mattingly, Miller, Saylor, Scampone, Seeba, and Whittaker kept him in hard restraints or four-point restraints for seventeen (17) days in unsanitary and inhumane conditions in order to punish him for refusing to accept a dangerous cell assignment. Id. at ¶ 179. He alleges that Defendant Bledsoe authorized and approved of Plaintiff's placements in restraints, both "ambulatory" and four-point, from February 3, 2011 to March 2, 2011 and again from May 17, 2011 to June 2, 2011. Id. at ¶ 180. He contends that Defendant Bledsoe ordered these restraint placements knowing and approving of the excessively tight manner in which the restraints were applied, the prolonged time period during which Plaintiff was subjected to the restraints, and the conditions in the cells in which Plaintiff was kept in restraints. Id. at ¶ 181. Despite this knowledge, Defendant Bledsoe refused to taken any actions to stop the harm being inflicted on Plaintiff and instead ordered that the abusive treatment be continued. Id. at ¶ 182. Defendant Bledsoe refused to order Plaintiff released from restraints, although he had the authority to do so. Id. at ¶ 183. Plaintiff states that as a direct result of Defendants' acts, Plaintiff suffered, and continues to suffer, the following injuries and damages, "violation of his rights under the Fifth and Eighth Amendments to the United States Constitution, physical injuries, pain and suffering, and emotional distress." Id. at ¶ 186. For relief, Plaintiff seeks injunctive relief, as well as compensatory and punitive damages.

### B.   Qualified Immunity

Defendants assert that they are entitled to qualified immunity. See (Doc. 28, brief in support at 8-22). Qualified immunity provides not merely a "defense to liability," but rather, "immunity from suit." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (quoting Mitchell v. Forsyth,

472 U.S. 511, 526 (1985)). It is therefore important to "resolv[e] immunity questions at the earliest possible stage in the litigation." Pearson v. Callahan, 555 U.S. 223, 232 (2009) (quoting Hunter, 502 U.S. at 227). Certain officials performing "discretionary functions," are shielded from suit if their conduct did not violate a "clearly established statutory or constitutional right[ ] of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); see also Wilson v. Layne, 526 U.S. 603, 609 (1999). Also, if an official reasonably believes his conduct to be lawful, he is protected by qualified immunity, which affords "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Kelly v. Borough of Carlisle, 622 F.3d 248, 254 (3d Cir. 2010) (quoting Hunter, 502 U.S. at 229).

Application of qualified immunity implicates two distinct inquiries. The first inquiry evaluates whether the defendant violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201–02 (2001), abrogated in part by Pearson, 555 U.S. 223; Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006). If the plaintiff fails to put forth evidence that the defendant committed a constitutional infraction, then the court must dispose of the claim in the defendant's favor. Saucier, 533 U.S. at 201; see also Wilson, 526 U.S. at 609. However, if the evidence shows that the defendant committed a constitutional violation, the second inquiry assesses whether the right in question was "clearly established" at the time the defendant acted. Pearson, 555 U.S. at 231-32; Saucier, 533 U.S. 201–02. A right is "clearly established" if a reasonable actor under the circumstances would have known that his or her conduct impinged upon constitutional mandates. Pearson, 555 U.S. 223; Williams, 455 F.3d at 191. Hence, a defendant may not invoke qualified immunity if the defendant's conduct diverges from that of a reasonable

actor under the circumstances. <u>Williams</u>, 455 F.3d at 191. The court is not required to conduct

these inquiries sequentially. <u>Pearson</u>, 555 U.S. at 240. The court may eschew difficult

constitutional issues and award qualified immunity to a defendant if it is apparent that the

defendant did not violate rights that were clearly established at the time the defendant acted. <u>Id</u>.

If immunity is raised at the summary judgment stage, and if the court chooses to address the

plaintiff's showing of constitutional violations—the first inquiry described above—then the court's

analysis of the alleged violations essentially merges with its analysis of the merits. <u>See</u> <u>Gruenke v.</u>

<u>Seip</u>, 225 F.3d 290, 299–300 (3d Cir. 2000); <u>Russoli v. Salisbury Twp.</u>, 126 F. Supp. 2d 821,

838–41 (E.D. Pa. 2000); <u>see</u> <u>also</u> <u>Grant v. City of Pittsburgh</u>, 98 F.3d 116, 122 (3d Cir. 1996)

("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the

record ... to establish ... a detailed factual description of the actions of each individual defendant

(viewed in a light most favorable to the plaintiff).").

   1.   <u>**Whether Defendants Violated Richardson's Eighth Amendment[6]**</u>
        <u>**Rights.**</u>

The Eighth Amendment protects prisoners from cruel and unusual punishment, including

"the unnecessary and wanton infliction of pain." <u>Hudson v. McMillian</u>, 503 U.S. 1, 5 (1992)

(quoting <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986)); <u>see</u> <u>also</u> U.S. const. amend. VIII. To

prevail on an Eighth Amendment claim, an inmate must show: (1) a deprivation that is objectively

---

[6]Because Plaintiff relies on the same evidence to establish both a Fifth and Eighth
Amendment claim and because the Eighth Amendment "'is specifically concerned with the
unnecessary and wanton infliction of pain in penal institutions, serves as the primary source
of substantive protection to convicted prisoners in cases such as this one, where the deliberate
use of force is challenged as excessive and unjustified,'" the more-specific-provision rule of
the Eighth Amendment forecloses Plaintiff's Fifth Amendment claim as a matter of law.
<u>Betts v. New Castle Youth Dev. Ctr.</u>, 621 F.2d 249, 260-61 (3d Cir. 2010) (quoting <u>Whitley</u>
<u>v. Albers</u>, 475 U.S. 312, 327 (1986)).

sufficiently serious; and (2) "a sufficiently culpable state of mind" of the defendant official. See Farmer v. Brennan, 511 U.S. 825, 834 (1994).

There are separate standards for Eighth Amendment violations depending on the type of claim. An Eighth Amendment challenge to prison conditions is subject to the deliberate indifference standard. See Fuentes v. Wagner, 206 F.3d 335, 345 (3d Cir. 2000) (citing Farmer, 511 U.S. at 837). Prison officials are deliberately indifferent when they know of and disregard a substantial risk of serious harm to a prisoner. Farmer, 511 U.S. at 836. Furthermore, a prisoner must produce evidence of serious or significant physical or emotional injury resulting from a challenged prison condition. Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995). An Eighth Amendment challenge asserting excessive force is subject to a malicious and sadistic standard. The inquiry under this standard is whether prison officials applied force "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Hudson, 503 U.S. at 6 (citations and quotations omitted); see also Fuentes, 206 F.3d at 345. In an excessive force case, a prisoner need not show significant injury; however, de minimis uses of physical force are insufficient to establish an Eighth Amendment violation. Hudson, 503, U.S. at 9–10. Excessive force claims are typically based in emergency situations where prison officials must use force and act quickly and decisively to maintain or restore discipline. See Hudson, 503 U.S. at 6–7.

Although, the initial use of restraints may properly be characterized as an excessive force claim, the court concludes that the prolonged use of restraints at issue here is more properly analyzed under the deliberate indifference standard. See A.M. ex. rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 587 (3d. Cir. 2004) (concluding that the deliberate indifference

-22-

standard is appropriate where it did not appear that officials "were required to make split-second decisions to maintain or restore order through the use of excessive physical force"); Howard v. Bureau of Prisons, 2008 WL 318387, *13 (M.D. Pa. 2008) ("Outside the context of a prison disturbance, which is characterized as 'a single instance of prisoner unrest where there is a need to act quickly,' Eighth Amendment claims are judged by the deliberate indifference standard."); Trammell v. Keane, 338 F.3d 155, 162–63 (2d Cir. 2003) (applying deliberate indifference standard in determining whether deprivation orders, depriving prisoner of certain amenities, were reasonably calculated to restore prison discipline and security). But see Zimmerman v. Schaeffer, 645 F. Supp. 2d 226, 248 (M.D. Pa. 2009).[7]

A prisoner must show extreme deprivations to make out a viable conditions of-confinement claim. Hudson, 503 U.S. at 9. "[O]nly those deprivations denying 'the minimal civilized measures of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." Hudson, 503 U.S. at 9, quoting Wilson, 501 U.S. at 298 (quoting Rhodes v. Chapman, 452 U.S. 337, 346, (1981)). A prisoner's Eighth Amendment rights are violated when prison officials "act[ ] or fail[ ] to act with deliberate indifference to a substantial risk of serious harm to a prisoner." Farmer, 511 U.S. at 836; Kaucher v. Cnty. of Bucks, 455 F.3d 418, 427 (3d Cir. 2006). The test is subjective:

---

[7]In Zimmerman v. Schaeffer, 654 F. Supp. 2d 226 (M.D. Pa. 2009), the Honorable Sylvia Rambo concluded that, in the factual circumstances of that case, the use of restraints was more appropriately viewed as an excessive force case. Id. at 248–49. There, the application of restraints was "closely connected to the use of force in initially subduing Plaintiffs in each incident, and in all cases, a lengthy application of mechanical restraints was authorized in advance." Id. at 249. In the present matter, this Court finds the deliberate indifference standard to be appropriate given the divergent factual circumstances. Here, the initial use of force against Richardson was unplanned and there is no evidence in the record to suggest that USP-Lewisburg officials intended a lengthy restraint period.

-23-

> [A] prison official cannot be found liable ... unless the person knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer, 511 U.S. at 837; see also Fuentes, 206 F.3d at 345 & n.12.  A prison official's subjective state of mind can be inferred when the risk of harm is obvious.  See Hope v. Pelzer, 536 U.S. 730, 738 (2002); Beers–Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001) (stating that "subjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk").  The length of confinement in the challenged prison condition is a relevant factor in Eighth Amendment analysis.  See Hutto v. Finney, 437 U.S. 678, 686 (1978); Hope v. Pelzer, 536 U.S. 730 (2002); Holley v. Johnson, 2010 WL 2640328,*12 (W.D. Va. 2010).

Defendants assert that they cannot be held deliberately indifferent as to the health and safety of Richardson because: (1) it is important to the safety and security of the institution and all those who reside and work within it that inmates comply whenever they are given direct orders from staff; (2) Plaintiff acknowledges that he had the power to release himself from the restraints by simply agreeing to comply with the orders to accept the new cellmates; (3) there is currently no evidence that Plaintiff was injured by improperly applied restraints, and in light of Plaintiff's statements that medical staff performed "restraint checks," it would be logical for nonmedical staff to assume that the restraints were not causing Plaintiff injury; see Ayala v. Terhune, 195 F. App'x 87, 91 (3d Cir. 2006) (affirming district court dismissal of claim that prison officials did not adequately respond to prison grievances regarding medical care where the plaintiff was under the care of physician) (citing Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993); White v. Farrier,

-24-

849 F.2d 322, 327 (8th Cir. 1988)); (4) if inmates were allowed to refuse to obey direct orders without any negative consequences, there would be no way that staff could maintain control over the high security prison population at USP-Lewisburg, and staff, inmates, the institution, and the community at large could all become endangered by their inability to control the prison population; and (5) Plaintiff does not allege that staff provided him with no way to lessen the amount of restraints placed upon him by simply adjusting his own behavior, and his allegations include instances when he was released from his restraints only to be placed back into them when he again refused a direct order. (Doc. 28 at 19-20).

Nonetheless, the Court concludes that there remains disputed issues of material fact as to whether Defendants were deliberately indifferent to an excessive risk to Richardson's health and safety. Richardson asserts that the ambulatory restraints caused swelling, pressure sores, abrasions, cuts, numbness, and nerve damage. (Doc. 21 at ¶ 134). Richardson asserts that he was unable to lie down flat, to bathe, or to clean himself after use of the facilities. He claims he complained to prison officials and medical staff several times about losing feeling in his arms and legs and circulation in his wrists. According to Richardson, prison officials ignored his complaints and requests for medical attention.

Taking this evidence in the light most favorable to the nonmoving party and making all reasonable inferences therefrom, the Court concludes that Plaintiff has set forth sufficient allegations that Defendants were deliberately indifferent to a substantial risk of serious harm to Plaintiff in violation of the Eighth Amendment, and that the harm was obvious. Therefore, the Court must move to the second prong of the qualified immunity analysis and determine whether the right was clearly established.

2.  **Whether Richardson's Rights Were Clearly Established.**

To determine whether a government official is entitled to qualified immunity, the court must ascertain "whether a reasonable public official would know that his or her specific conduct violated clearly established rights." Grant, 98 F.3d at 121 (citing Anderson v. Creighton, 483 U.S. 635, 636–37 (1987)). The Supreme Court has warned against conceptualizing an individual's rights at too distant a "level of generality," and it has held that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 639–40; McKee v. Hart, 436 F.3d 165, 171 (3d Cir. 2006). The court must examine whether the defendant should have known that his or her actions contravened statutory or constitutional guarantees. Gruenke, 225 F.3d at 299–300. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson, 483 U.S. at 640 (citation omitted). Thus, whether a right is clearly established is a fact specific inquiry undertaken in the context of the case. See McKee, 436 F.3d at 171.

Defendants claim that maintaining Plaintiff in ambulatory restraints for twenty-eight (28) days was not an obvious violation of his Eighth Amendment rights. They assert that "there is no authority that staff cannot place inmates in restraints for periods of time when the inmate has refused an order." (Doc. 37, at 12).

Admittedly, '[t]here are relatively few cases dealing with keeping an inmate in handcuffs for a prolonged period of time." Barker v. Goodrich, 2010 WL 55719 (S.D. Ohio 2010). Despite

-26-

the paucity of factually similar precedent, a defendant may be on notice that his conduct violates

clearly established law in novel factual circumstances. Hope v. Pelzer, 536 U.S. 730, 741 (2002).

In Hope v. Pelzer, the Supreme Court found that restraining an inmate to a hitching post for

seven (7) hours violated a clearly established constitutional right.  The prisoner in Hope was

restrained in a standing position, with his shirt off, subject to sunburn and scorching heat, without

water or bathroom breaks and taunted by corrections officers. Id. at 734–35.  The Court found that

a reasonable person would have known this conduct to be in clear violation of the Eighth

Amendment. Id. at 741–42.  The Court also referenced state correctional facility regulations,

Eleventh Circuit precedent, and a Department of Justice report advising of the "constitutional

infirmity" of hitching posts, in support of its conclusion. Id. at 741–42.

In the instant matter, Defendants cite to cases involving the prolonged restraint of prisoners

in handcuffs or ambulatory restraints in which courts have held there was no clearly established

Eighth Amendment violation, even post-Hope.  However, none of those cases approximate the

factual circumstances in the instant matter.  In fact, the Court has not identified a single case in

which an inmate was held in ambulatory restraints (or any other type of restraints) for more than

three (3) days. See Key v. McKinney, 176 F.3d 1083, 1086 (8th Cir. 1999) (no Eighth Amendment

violation where prisoner handcuffed and shackled for twenty-four (24) hours); Hunter v. Bledsoe,

2010 WL 3154963 (M.D. Pa. 2010) (ambulatory restraints used for twenty-four (24) hours);

Holley, 2010 WL 2640328 (ambulatory restraints used for forty-eight (48) hours); Moore v. Miller,

2009 WL 113258 (W.D. Va. 2009) (twenty-six (26) hours); Keyes v. O'Brien, 2006 WL 2125912

(W.D. Va. 2006) (no Eighth Amendment violation where prisoner placed in ambulatory restraints

for thirty (30) hours); Garraway v. United States, 2006 WL 3054606, *8 (D. Colo. 2006) (fifty (50)

-27-

hours in ambulatory restraints); <u>Saleh v. Ray</u>, 2003 WL 23484639, *6 (D. Kan. 2003) (twenty-four (24) hours in ambulatory restraints, no Eighth Amendment violation); <u>see also</u> <u>Zimmerman</u>, 654 F. Supp. 2d at 232 (nineteen (19) hours or more in restraint chair).  In the instant matter, Plaintiff alleges that he remained in restraints for twenty-eight (28) consecutive days.  Like <u>Hope</u>, this Court finds such conduct an "arguably obvious" violation of the Eighth Amendment.  <u>See</u> <u>Hope</u>, 536 U.S. at 741 ("Arguably, the violation was so obvious that our own Eighth Amendment cases gave respondents fair warning that their conduct violated the Constitution.").

The Court's conclusion is buttressed by the special reporting requirements implicated whenever an inmate is placed in restraints for more than eight (8) hours.  It is undisputed that the prolonged restraint of Richardson compelled Defendants to provide frequent status reports.  Prison regulations also required constant monitoring of prisoners in restraints.  <u>Hope</u> indicates that excessive, prolonged restraint of inmates violates the Eighth Amendment.  Notwithstanding the significant factual distinctions between <u>Hope</u> and the present matter, a reasonable official in Defendants' position would have known that placing Richardson in restraints for twenty-eight (28) days violated the Eighth Amendment. Taking <u>Hope</u> together with the BOP regulations regarding use of ambulatory restraints, Defendants had fair notice that their alleged conduct, if proven true, violated a clearly established right under the Eighth Amendment.  Thus, the Court rejects the defense of qualified immunity.

### C.    **Motion for a More Definite Statement**

Defendants ask, in the alternative, that the Court order Plaintiff to file a more definite statement of his claim pursuant to Federal Rule of Civil Procedure 12(e).  Rule 12(e) provides that a "party may move for a more definite statement of a pleading to which a responsive pleading is

-28-

allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response."
FED. R. CIV. P. 12(e). Defendants argue that they cannot prepare a responsive pleading in this case
because many of Plaintiff's specific allegations do not name a specific Defendant, making it
impossible for Defendants to properly respond.

"Because Federal Rule of Civil Procedure 8 requires only a short and plain statement of the
claim, motions for a more definite statement are 'highly disfavored'." Country Classics at Morgan
Hill Homeowners' Ass'n v. Country Classics at Morgan Hill, LLC, 780 F. Supp. 2d 367, 371 (E.D.
Pa. 2011) (quoting Hughes v. Smith, 2005 WL 435226, *4 (E.D. Pa. 2005)). "Therefore, 12(e)
motions will be granted only 'if a pleading is so vague or ambiguous that the opposing party cannot
reasonably be required to make a responsive pleading.'" Id. (citing S.E.C. v. Saltzman, 127 F.
Supp. 2d 660, 667 (E.D. Pa. 2000)). A motion for more definite statement is "'used to provide a
remedy for an unintelligible pleading rather than as a correction for a lack of detail.'" Premier
Payments Online, Inc. v. Payment Sys. Worldwide, 848 F. Supp. 2d 513, 522 (E.D. Pa. 2012)
(quoting Frazier v. SEPTA, 868 F. Supp. 757, 763 (E.D. Pa. 1994), and citing Country Classics,
780 F. Supp. 2d at 371). Rule 12(e) is thus " 'directed to the rare case where because of the
vagueness or ambiguity of the pleading the answering party will not be able to frame a responsive
pleading.'" Id. (quoting Schaedler v. Reading Eagle Publ'n, Inc., 370 F.2d 795, 798 (3d Cir. 1967)).

Defendants do not claim that the Amended Complaint is unintelligible. Rather, they
complain that the Amended Complaint makes general references to "staff", "unnamed members of
the 'Use of Force Team'," "medical staff," and "unidentified lieutenants." The Court notes,
however, that it is unnecessary to identify each person listed in the Amended Complaint in order to
provide sufficient notice to Defendants of the basis of the claims against them. As such, the Court

concludes that the Amended Complaint is not so vague or ambiguous that Defendants cannot frame responsive pleadings.  See Pozarlik v. Camelback Assocs., Inc., 2012 WL 760582, *2 (M.D. Pa. 2012) ("Granting a Rule 12(e) motion is appropriate only when the pleading is 'so vague or ambiguous that the opposing party cannot respond, even with a simple denial, in good faith, without prejudice to itself.'"), quoting Sun Co. v. Badger Design & Constructors, 939 F. Supp. 365, 368 (E.D. Pa. 1996).  Defendants' request for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e) is, therefore, denied.

A separate Order will be issued.

Dated: April 9, 2013

_____
United States District Judge