# EXHIBIT 22

1  the basis for your knowledge. Regardless of whether
2  the Government identified you or how you came to be
3  here, what is the basis of your knowledge of
4  separations and the matter in item number three?
5      A   I'm the case management coordinator at
6  Lewisburg and I'm also the CIM coordinator, Central
7  Inmate Monitoring coordinator.
8          Inmates that are CIM cases are inmates that
9  require special management needs and there's further
10 tracking and monitoring of any type of movement for
11 these type of inmates.
12         So one of the main assignments for CIM cases
13 is separation and that is an official separation
14 loaded on them from one inmate and another inmate
15 whether they were in an altercation or perhaps at the
16 time of sentencing AUSA requested separation, so that
17 follows them throughout their incarceration.
18         There could be an investigation that's done
19 inside the institution where it's determined that
20 these individuals need to remain separated.  I am the
21 person that puts those separations on and load them at
22 the institutional level.
23     Q   And so when you said, for example, the AUSA
24 assigns separation, that would be because someone
25 testified at a trial against someone else or

```
 1  away from any CIM separation that they have.
 2  BY MR. DAVY:
 3      Q    Just to be clear, I think there's a
 4  difference between a blanket asking to be separated
 5  from everyone versus asking to be separated from
 6  individual people.  You just said that it is not great
 7  to be a sex offender in the USP.
 8      A    Right.
 9      Q    Which I think we'll all acknowledge is
10  correct.
11      A    Yes.
12      Q    But you also said that that person can't be
13  presumptively separated from everyone which I
14  understand.  So what do you do in terms of separations
15  with individuals who are sex offenders?
16      A    I have nothing to do with the housing and the
17  cell assignments.  I know very -- I mean I know the
18  gist of how they do it which they're called keep aways
19  and the lieutenants handle that stuff.
20           So if an inmate needs to be kept away from a
21  variety of people, they can do that housing wise.
22  That's totally separate from CIM separations on the
23  records.
24           So they can do keep aways and maybe house,
25  for example, house a sex offender with another sex
```

```
 1   offender, but they'll keep them away from other
 2   inmates that they shouldn't be around.
 3       Q   Can you tell me more about a keep away?  Can
 4   you describe that in more detail?
 5           MR. BUTLER:  Objection.  That's not her
 6   expertise.
 7           MR. DAVY:  I'm just asking a follow-up
 8   question to something that you raised.
 9           MR. BUTLER:  But she prefaced that with I'm
10   not familiar with it.  So I would object that you
11   stick to number three.
12           MR. DAVY:  You can answer anyway.
13           MR. BUTLER:  To the extent you're not asking
14   about one through ten, this is a 30(b)(6) deposition
15   so I would ask that she's only here to testify as to
16   number three.
17           MR. DAVY:  It sounds similar to a separation
18   in that it's about keeping inmates separate from each
19   other.
20           MR. BUTLER:  Separations are completely
21   different.  This is number three.  You can answer if
22   you can, if it's part of your expertise.
23           THE WITNESS:  Yeah.  I don't handle the keep
24   aways.  They utilize that in housing and cell
25   assignments and recreation and shower.  That's all I
```

1  know about that.  I do not handle that.  It is
2  separate from CIM separation.
3  BY MR. DAVY:
4      Q   Okay.  So let's go back to the -- when
5  inmates raise issues that they think are worthy of
6  separations.
7          I guess -- were you going to say something,
8  Mike?
9          MR. BUTLER:  Can you repeat that question?
10         MR. DAVY:  It wasn't a question.  I was
11 saying we're going to go back to the issue of
12 assessing the validity of an inmate asking for
13 separations.  That was the preface.
14 BY MR. DAVY:
15     Q   Do you -- I guess I want to go back to the
16 process of evaluating them.  I guess I'm curious as to
17 why they need to be evaluated at all in the sense that
18 are -- if every separation that an inmate requested
19 were presumptively valid and entered into the system,
20 would that somehow overwhelm the system?
21     A   Oh, yes, it definitely would.  There has to
22 be -- in order for a CIM separation to be loaded,
23 there has to be some type of documentation to support
24 that and to validate that separation.
25     Q   Is that -- so is that because they're -- I

1  which again, is squarely within number three of the
2  notice. But I'll rephrase then. I'm happy to do
3  that.
4  BY MR. DAVY:
5      Q   To the extent that inmates ask for
6  separations because they are actually fearful of being
7  in a cell with an individual, even if that threat --
8  or even if that separation request is ultimately found
9  to not be valid, would an individual -- would there
10 still be value in keeping those inmates apart?
11         MR. BUTLER: Objection. Argumentative. You
12 can answer, if you can.
13         THE WITNESS: I mean, like I said before, if
14 an inmate -- if an inmate makes a request that they
15 fear to be around somebody else, they're going to keep
16 them separate while this process is going on while
17 they do an investigation. So they'll be kept
18 separate.
19         And once it's verified, then it can be loaded
20 as a CIM separation. If it's found unwarranted, then
21 it won't be loaded as a CIM separation. It's the
22 policy. It requires some form of documentation to
23 substantiate the separation and the need for it.
24 BY MR. DAVY:
25     Q   So when you say -- so actually, I have a few

```
1   be accessing that?
2       A   Well, R and D staff, the records staff.
3       Q   Sorry.  R and D meaning?
4       A   Receiving and discharging that process the
5   inmates in and out.
6       Q   At some point in the last six years have
7   there been ADXL's at Lewisburg in the SMU?
8       A   ADXL's?
9       Q   Like even additional level of segregation
10  beyond the SMU?
11      A   Yes.
12      Q   What role does separations play in inmates
13  ending up in that unit of custody?
14      A   I don't have any knowledge of that.
15      Q   Okay.  Do you have any idea how inmates end
16  up there as opposed to being in the SMU?
17      A   Not specifically, no.
18      Q   I also want to ask a couple follow-up
19  questions on inmates requesting separations versus
20  separations being assessed sort of independently.
21          To your knowledge you said that most of these
22  separation evaluations are not because they were
23  requested by inmates; is that correct?
24      A   Correct.
25      Q   So they're mostly initiated by?
```

1    A    I mean threat assessments that the SIS does a
2 lot of the separations are loaded based on
3 altercations that have occurred so after the fact,
4 after something has happened where inmates there was
5 no reason to believe that they had issues with one
6 another, they get into an altercation, then that CIM
7 separation is loaded after the fact.
8    Q    Are there types of altercations between
9 inmates after which they would not receive a
10 separation that was loaded into the system?
11    A    No.  Pretty much -- each day we receive the
12 lieutenant's synopsis, the lieutenant's log.  And any
13 altercation that occurred we load them as separations.
14 We air on the side of caution and we'll load them as
15 CIM separations.
16    Q    When you say altercation, you mean physical?
17    A    Physical altercation, yeah.  In the rec cage
18 or in the cell.
19    Q    How about verbal altercations?
20    A    We don't receive notice on verbal
21 altercations necessarily.
22    Q    So is there anything -- is there anything
23 beyond a physical altercation that could be the basis
24 for a separation?
25    A    There's been threatening.  An inmate

1    threatened another inmate and we will separate them
2    based on that.
3        Q    So anytime an inmate gets a misconduct for
4    threatening another inmate, does that result in a
5    separation?
6        A    Yeah.
7        Q    Every time?
8        A    I mean if there's documentation of that
9    threat, yes.  And where an inmate has said that he
10   would -- if he were to be housed with such and such,
11   he's going to kill him, then yeah, he's going to be
12   separated.  We're going to air on the side of caution
13   with that.
14       Q    Okay.  So just so I'm clear, so if an
15   inmate -- so we were talking before about when inmates
16   request separations, and you were saying that that all
17   needs to be validated through documentation.
18            And we're now talking about not --
19   separations that do not originate from inmates but
20   originate from inmate conduct.  And you just said that
21   if an inmate threatens another inmate, that because
22   you air on the side of caution, that inmate will
23   presumptively be separated from that other inmate; is
24   that correct?
25       A    Yes.

1    Q    Okay. So would an inmate -- do inmates know
2  that they will be separated on the basis of making a
3  threat about another inmate?
4         MR. BUTLER:  Objection to the extent you're
5  asking her do inmates know. She's not here to testify
6  as to what inmates know. She could never possibly
7  answer that question.
8  BY MR. DAVY:
9    Q    I guess what I'm getting at is -- let me ask
10 it like this.
11        Does staff know that inmates who threaten
12 another inmate will presumptively receive a
13 separation?
14   A    I don't know the answer to that. I don't
15 know what most staff know and what they don't know.
16 And if an inmate threatens another inmate and he
17 receives an incident report for that threat, that
18 incident report is the documentation for us to load
19 that separation. So whether or not staff know that, I
20 can't answer that.
21   Q    Okay. Do you think it is possible -- in your
22 knowledge, do you think it is possible that some
23 amount of nonspecific -- let me rephrase.
24        In your knowledge, do you think it is
25 possible that some amount of threats that inmates make